Hugh R. Elwyh, J.
The Commissioner of Health of Ulster County brings this neglect proceeding pursuant to article 10 of the Family Court Act, charging that Kevin Sampson, a male child under 16 years, of age is neglected by reason of the failure of his mother, Mildred Sampson to provide him with proper medical and surgical care. The mother is not opposed to having the recommended surgery performed upon her son, but, because she is a member of the religious sect known as Jehovah’s Witnesses she has steadfastly refused to give her consent to the administration of any blood transfusions during the course of the surgery, without which the proposed surgery may not safely be performed. After extensive hearings the court finds that the following facts are established by the evidence.
The boy, Kevin Sampson, who is now 15 years of age, having been born on January 25, 1955, suffers from extensive neurofibromatosis or von Recklinghausen’s disease which has caused a massive deformity of the right side of his face and neck. The outward manifestation of the disease is a large fold or flap of an overgrowth of facial tissue which causes the whole cheek, the corner of his mouth and right ear to drojp down giving him an appearance which can only be described as grotesque and repulsive. Fortunately, however, the disease has not yet progressed to a point where his vision has been affected or his hearing impaired. Dr. Robert 0. Lonergan, an eye doctor appointed by the court to examine Kevin, reported that “ I do not believe ocular condition related to systemic disease — in any event it does not alter or require any change in treatment — the eye condition requires no treatment. ’ ’ Dr. Elbert Lough-ran, an ear doctor appointed by the court to examine Kevin, reported that he found ‘ ‘ normal drum heads bilateral. Effect on hearing limited to occlusion of external ear canal on right by folds of skin. The left ear drum and canal are normal. Gross hearing normal on both sides.”
Thus, insofar as the boy’s sight and hearing are concerned, it appears from the doctor’s reports that the neurofibromatosis *660 poses no immediate threat to either, and that there is, therefore, no need for treatment of either his eyes or his ears. However, the massive deformity of the entire right side of his face and neck is patently so gross and so disfiguring that it must inevitably exert a most negative effect upon his personality development, his opportunity for education and later employment and upon every- phase of his relationship with his peers and others. Although the staff psychiatrist of the County Mental Health Center reports that 1 ‘ there is no evidence of any thinking disorder ” and that “in spite of marked facial disfigurement he failed to show any outstanding personality aberration ’ ’, this finding hardly justifies a conclusion that he has been or will continue to be wholly unaffected by his misfortune. Although Kevin was found to be not psychotic, a psychologist found him to be a “ boy (who) is extremely dependent and (who) sees himself as an inadequate personality.” The staff psychiatrist reports that 1‘ Kevin demonstrates inferiority feeling and low self concept. Such inadequate personality is often noted in cases of mental retardation, facial disfigurement and emotional deprivation. ’ ’
If the boy exibited to the psychologist some mental retardation it is hardly surprising in view of the fact that he has been exempted from school since November 24, 1964 and is currently exempted from school by reason of his facial disfigurement. As a result, although various tests administered by school authorities show him to be intellectually capable of being educated and trained to a reasonable level of self-sufficiency, he is, at 15 years of age, a virtual illiterate.
Prom all the information available to the court as the result of extended hearings and various reports, particularly those supplied by those educators who have become familiar with the pattern of Kevin’s development, or more accurately, the lack thereof, the conclusion is inescapable that the marked facial disfigurement from which this boy suffers constitutes such an overriding limiting factor militating against his future development that unless some constructive steps are taken to alleviate his condition, his chances for a normal, useful life are virtually nil.
The unanimous recommendation of all those who have dealt with the many problems posed by Kevin’s affliction — educators, psychologists, psychiatrists, physicians and surgeons — is that steps be taken to correct the condition through surgery. It is conceded, however, by the surgeons that, insofar as his health and his life is concerned, this is not a necessary opera *661 tion. The disease poses no immediate threat to his life nor has it as yet seriously affected his general health. Moreover, the surgery will not cure him of the disease. In fact, for the condition from which he suffers there is no known cure. According to Dr. Brandon Macomber, one of the highly qualified plastic surgeons who testified as to the need for surgery, “where (the disease) is interfering with function or appearance many times it can be excised partially, it never can be cured, but it can be excised, removed and by plastic procedures you may be able to improve not only the function but the appearance.” The surgery which the surgeons recommend for the alleviation of the diseased condition cannot, however, be performed without substantial risk. In the words of Dr. Ferdinand Stanley Hoffmeister, the other highly qualified surgeon who testified as to the need for corrective surgery and who had previously performed some limited surgery upon this boy, “I think it’s a dangerous procedure. I think it involves considerable risk. It’s a massive surgery of six to eight hours duration with great blood loss. This is a risky surgical procedure.” When asked if the risk would be much above average he replied, ‘ ‘ much, much, much.” The surgeon repeatedly “ emphasiz(ed) the surgery risk in operating on this patient even with blood.” Without the mother’s permission to administer blood transfusions the risk becomes wholly unacceptable. According to Dr. Hoffmeister, ‘ ‘ if this tumor had to be removed as extensively as it is desirable to improve his appearance, I think the loss of blood would be so extensive, that I personally would not dare to undertake such a procedure having only plasma expanders at my disposal ”. The surgeons are adamant in their refusal to operate upon Kevin unless they have permission to use blood and to administer during the surgery such blood transfusions as the patient’s condition requires.
Mrs. Sampson, while not opposed to surgery as such, having already given permission for surgery limited to the use of plasma, is equally adamant in her refusal to give her consent to the use of blood. As previously noted, Mrs. Sampson is an adherent to the religious sect known as Jehovah’s Witnesses who according to the minister of the Kingston Congregation of Jehovah’s Witnesses “feel that the Bible is explicit on the matter of taking any form of blood into our system either by eating, through mouth, food, through the body, through the veins. This is specifically prohibited in the Scriptures for Christians ”. Although not opposed to medicine or surgery *662 on religious grounds, Jehovah’s Witnesses hold as a cardinal principle of their faith that the eating or ingestion of blood into the body by any means whatever, including modern surgical procedures for the transfusion of blood are explicitly forbidden by the law of God. According to Jehovah’s Witnesses’ doctrine, the divine proscription dates back to God’s pronouncement to Noah immediately after the global flood over 4,300 years ago[1], was reiterated and emphasized to the Jews when the Nation of Israel was brought into the covenant relationship with Jehovah[2], applies to the eating of human blood as well as animal blood[3] and was made applicable to Christians by the new covenant made over the blood of Jesus Christ.[4] Jehovah’s Witnesses regard the prohibition against the consumption of blood as more than a mere dietary law of the Jews — the eating of blood in any form is a sin against God[5] and draws upon the soul of the transgressor the enmity of God[6]. (“ Blood, Medicine and the Law of God.” Watchtower Bible and Tract Society, 1961; State v. Perricone, 37 N. J. 463.)
While Jehovah’s Witnesses emphasize that their refusal to submit to blood transfusions is based upon the law of God as recorded in their Bible, New World Translation of the Holy Scriptures, they find further support for their position in the substantial risk to health and even to life which medical science acknowledges to be inherent in the transfusion of human blood. In addition to the adverse reaction in a patient to be anticipated from the mismatching of incompatible blood types or the oft time fatal consequences of a circulatory overload or an air embolism caused by inept procedures, the court finds considerable support for the Witnesses’ fear that the current widespread practice of using blood from commercial blood banks poses a serious risk to the patient’s health through the transmission of such diseases as syphilis, malaria, hepatitis and a variety of allergic conditions[7].
*663 Finally, the court finds that the child’s parent has been offered the financial means with which to have the recommended surgery performed, but that for the reasons heretofore expressed she adamantly refuses to give her consent.
THE JURISDICTION AND POWER OP THE COURT
The Constitution of the State of New York provides in subdivision b of section 13 of article VI that “ The family court shall have jurisdiction over the following classes of actions and proceedings which shall be originated in such family court in the manner provided by law: (1) the protection, treatment, correction and commitment of those minors who are in need of the exercise of the authority of the court because of circumstances of neglect, delinquency or dependency, as the legislature may determine
11 The family court has exclusive original jurisdiction over (i) abuse and neglect proceedings, as set forth in article ten.” (Family Ct. Act, § 115.)
“This article is designed to establish procedures. to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being. It is designed to provide a due process of law for determining when the state, through its family court, may intervene against the wishes of a parent on behalf of a child so that his needs are properly met.” (Family Ct. Act, § 1011.)
“ The family court has exclusive original jurisdiction over proceedings under this article alleging abuse or neglect of a child.” (Family Ct. Act, § 1013.)
“ When used in this article and unless the specific context indicates otherwise: * * *
“(f) ‘ Neglected child ’ means a child less than eighteen years of age
“ (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care
“ (A) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care, though financially *664 able to do so or offered financial or other reasonable means to do so ” (Family Ct. Act, § 1012).
“ The family court [also] has jurisdiction over physically handicapped children ” (Family Ct. Act, § 232, subd. [a]), and over 1 ‘ proceedings concerning physically handicapped and mentally defective or retarded children” (Family Ct. Act, § 115, subd. [b]).
“(c) 1 Physically handicapped child ’ means a person under twenty-one years of age who, by reason of physical defect or infirmity, whether congenital or acquired by accident, injury or disease, is or may be expected to be totally or partially incapacitated for education or for remunerative occupation, as provided in the education law, or is physically handicapped, as provided in section two thousand five hundred eighty-one of the public health law ” (Family Ct. Act, § 232, subd. [c]).
As defined in the Education Law “ A ‘ handicapped child ’ is one who, because of mental, physical or emotional reasons, cannot be educated in regular classes but can benefit by special services and programs to include, but not limited to, transportation, the payment of tuition to boards of cooperative educational services and public school districts, home teaching, special classes, special teachers, and resource rooms.” (Education Law, § 4401, subd. 1.)
“ Physically handicapped children ” are defined in the Public Health Law as follows: “ As used in this article: 1. ‘ Physically handicapped children ’ means any persons under twenty-one years of age who are handicapped by reason of a defect or disability, whether congenital or acquired by accident, injury, or disease, or who are suffering from long-term disease, including but without limiting the generality of the foregoing, cystic fibrosis, muscular dystrophy, nephrosis, rheumatic fever and rheumatic heart disease, blood dyscrasies, cancer, brain injured, and chronic asthma, or from any disease or condition likely to result in a handicap in the absence of treatment, provided, however, no child shall be deprived of a service under the provisions of this chapter because of the degree of mental retardation.” (Public Health Law, § 2581.)
11 Whenever a child within the jurisdiction of the court appears to the court to be in need of medical, surgical, therapeutic, or hospital care or treatment, a suitable order may be made therefor.” (Family Ct. Act, § 232, subd. [b].)
Whether this child be deemed to be “neglected” or “physically handicapped ’ ’, there is plainly ample constitutional and statutory authority for this court to entertain this proceeding *665 and to do whatever is necessary and appropriate to insure this child’s welfare. The authority to act for the child’s welfare includes the power to direct a surgical operation over the objection of parents (Matter of Seiferth, 309 N. Y. 80, 85; Matter of Vasko, 238 App. Div. 128, 129; Matter of Rotkowitz, 175 Misc. 948). The question is, however, whether the court should exercise the power which it undoubtedly has, to compel this boy to undergo a dangerous surgical procedure for the partial correction, but not a cure, of the facial deformity from which he suffers, over the sincerely held religious objection of his mother. The answer to this question requires a most careful balancing of the potential good to be attained against the risks to life necessary involved in so dangerous a surgical procedure and consideration of the validity of the religious objections which have been raised to the administration of blood transfusions. These two facets of the question will be examined in inverse order.
THE RELIGIOUS OBJECTIONS
The free exercise of religion is, of course, one of our most precious freedoms and is guaranteed by both the United States and New York State Constitutions. The First Amendment to the United States Constitution, made applicable to the States by virtue of the Fourteenth Amendment (Cantwell v. Connecticut, 310 U. S. 296, 303; Matter of Brown v. McGinnis, 10 N Y 2d 531, 535), provides that “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ”.
Section 3 of article I of the New York State Constitution provides that “the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind * * * but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.”
The courts have, however, drawn a distinction between the free exercise of religious belief which is constitutionally protected against any infringement and religious practices that are inimical or detrimental to public health or welfare which are not (Reynolds v. United States, 98 U. S. 145; Davis v. Beason, 133 U. S. 333). In Reynolds v. United States (supra) a case which dealt with the power of the State to outlaw the Mormon’s practice of polygamy in the name of religion, the United .States Supreme Court culled from the writings of Thomas Jefferson, *666 a strong supporter of the inclusion of the First Amendment in the Bill of Bights, to draw a distinction between religious belief and religious practice. The court said (p. 166): “ Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices.”
This distinction has been preserved and reaffirmed by the United iStates Supreme Court in subsequent decisions. In Cantwell v. Connecticut (310 U. S. 296, 303-304) the court set forth the dimensions of the free exercise of religion stating: “ The constitutional inhibition of legislation on the subject of religion has a double aspect. On the one hand, it forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship. Freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law. On the other hand, it safeguards the free exercise of the chosen form of religion. Thus the Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society ”.
In Prince v. Massachusetts (321 U. S. 158) the United States Supreme Court held that Massachusetts, acting to safeguard the general interest and well-being of its youth, could prohibit a child of a Jehovah’s Witness parent from distributing religious pamphlets on the street even though the child was accompanied by her adult guardian. The Massachusetts statute which prohibited such activities by a minor was not violative of Jehovah’s Witnesses’ freedom of religion, nor a denial of the equal protection of the laws, under the Fourteenth Amendment of the Constitution.
While recognizing (pp. 165-166) “the rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief” citing West Virginia State Bd. of Educ. v. Barnette (319 U. S. 624) and Pierce v. Society of Sisters (268 U. S. 510) the court in Prince v. Massachusetts (supra, p. 166) also said: “ But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. Reynolds v. United States, 98 U. S. 145; Davis v. Beason, 133 U. S. 333. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth’s well-being, the state as parens patriae may *667 restrict the parent’s control by requiring school attendance [State v. Bailey, 157 Ind. 342, cf. Meyer v. Nebraska, 262 U. S. 390; Pierce v. Society of Sisters, 268 U. S. 510; West Virginia State Bd. of Educ. v. Barnette, 319 U. S. 624], regulating or prohibiting the child’s labor [Sturgess & Burn Mfg. Co. v. Beauchamp, 231 U. S. 320; cf. Muller v. Oregon, 208 U. S. 412] and in many other ways [cf. People v. Ewer, 141 N. Y. 129]. Its authority is not nullified merely because the parent grounds his claim to control the child’s course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds [Jacobson v. Massachusetts, 197 U. S. 11]. The right to practice religion freely does not include the liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N. Y. 201, 68 N. E. 243 [See, also, State v. Chenoweth, 163 Ind. 94; Owens v. State, 6 Okla. Cr. 110]. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child’s welfare; and that this includes, to some extent, matters of conscience and religious conviction.” (Prince v. Massachusetts, supra, pp. 165-167.)
Specifically, the same issue presented here — i.e., the power of the State through its courts to order a necessary blood transfusion for a minor over the religious objections of a parent has been frequently contested by Jehovah’s Witnesses before. However, in every reported case that research has revealed in which the issue has been presented the courts have unequivocally upheld the power of the State to authorize the administration of a blood transfusion over the religious objections of the parent where the blood transfusion was shown to be necessary for the preservation of the minor’s life or the success of needed surgery (Hoener v. Bertinato, 67 N. J. Super. 517 [Juv. Dom. Rel. Ct. Bergen County 1961]; State v. Perricone, 37 N. J. 463 [Sup. Ct., N. J., 1962], supra; Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 42 N. J. 421 [Sup. Ct., N. J. 1964], cert. den. 377 U. S. 985; Wallace v Labrenz, 411 Ill. 618, cert, den. 344 U. S. 824; Morrison v. State, 252 S. W. 2d 97 [Mo. Ct. App. 1952]; Matter of Clark, 21 Ohio Op. 2d 86; Matter of Santos v. Goldstein, 16 A D 2d 755. See Failure to Provide Medical Attention for Child as Criminal Neglect, Ann. 12 ALE 2d 1047, 1050; Power of Public Authorities to Order Medical Care for a Child Over Objection of Parent or Custodian *668 Ann. 30 ALE 2d 1138; Guides to the Judge in Medical Orders Affecting Children, Council of Judges, National Council on Crime and Delinquency, Reprinted from Crime and Delinquency 1968).
A cogent expression of the civil authority’s answers to the scriptural authority relied upon by Jehovah’s Witnesses in support of their position may be found in the following excerpt from the Ohio court’s opinion in Matter of Clark (supra, pp. 89-90): “ To a layman unversed in the seemingly esoteric art of theological interpretation of the 17th century English version of ancient Hebrew and Greek Scriptures, these passages[8] are, to say the least, somewhat obscure. They have to do with blood and the eating or taking thereof. Blood transfusion as administered by modern medicine was unknown to the authors of these cryptic dicta. Had its beneficent effects been known to them, it is not unlikely some exception would have been made in its favor — especially by St. Luke who is said to have been a physician.
‘1 But in our humble Civil Court we must confine ourselves to the civil law of the state. Religious doctrines and dogmas, be they obviously sound or curiously dubious may not control. The parents in this case have a perfect right to worship as they please and believe what they please. They enjoy complete freedom of-religion. The parents also have the right to use all lawful means to vindicate this right (and in the present instance they appear to have done their full duty by their religion).
“ But this right of theirs ends where somebody else’s right begins. Their child is a human being in his own right, with a soul and body of his own. He has rights of his own — the right to live and grow up without disfigurement (emphasis supplied).
‘ ‘ The child is a citizen of the state. While he ‘ belongs ’ to his parents, he belongs also to his state. Their rights in him entail many duties. Likewise the fact the child belongs to the state imposes upon the state many duties. Chief among them is the duty to protect his right to live and to grow up with a sound mind in a sound body, and to brook no interference with that right by any person or organization (emphasis supplied).
*669 ‘ ‘ When a religious doctrine espoused by the parents threatens to defeat or curtail such a right of their child, the state’s duty to step in and preserve the child’s right is immediately operative.
“ To put it another way, when a child’s right to live and his parents’ religious belief collide, the former is paramount, and the religious doctrine must give way.”
In the light of the foregoing authorities I conclude that although the mother’s religious objections to the administration of a blood transfusion to her son in the event surgery is to be performed upon his face are founded upon the scriptures and are sincerely held, they must give way before the State’s paramount duty to insure his right to live and grow up without disfigurement— the right to live and grow up with a sound mind in a sound body. “ Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves ” (Prince v. Massachusetts, 321 U. S. 158, 170, supra).
THE POTENTIAL GOOD VS. THE BISK TO LIFE
In the opinion of the surgeons who are familiar with Kevin’s condition, the neurofibromatosis from which he suffers poses no immediate threat to his life or even to his general health and the proposed surgery for its excision would have no material effect upon his life expectancy. Fortunately, according to Dr. Macomber, “ To date there are no signs of any central nervous system, that is brain or spinal cord, involvement.”
It is not necessary, however, that a child’s life be in danger before this court may act to safeguard his health or general welfare. In Matter of Rothowitz (175 Misc. 948, 950) in which the Domestic Relations Court of New York ordered an operation for the correction of a deformity of the child’s right lower extremity the court said: “ I must conclude that it was the intention of the Legislature to give power to the justices of this court to order an operation not only in an instance where the life of the child is to be saved but also in instances where the health, the limb, the person or the future of the child is at stake. And in Matter of Seiferth (285 App. Div. 221, 224-225, revd. 309 N. Y. 80) the Appellate Division, referring to a 12-year-old boy who was afflicted with congenital hair lip and cleft palate, said: 11 There need be no ‘ emergency ’.
*670 * * * We believe that the infant respondent is both a neglected child and a physically handicapped child. He is neglected because his father refuses to furnish him with medical care which is needed. He is physicaly handicapped because, equally with the deaf and the crippled, he is partially incapacitated for education and remunerative occupation. It is immaterial that his physical life is not in danger. The statute contains no such requirement. What is in danger is his chance for a normal, useful life. It is a serious error to permit this twelve-year-old boy, a victim of his father’s delusions, to make such a choice for himself. ’ ’
This view of the court’s power and authority did not prevail, however, for the Court of Appeals (309 N. Y. 80) reversed the decision of the Appellate Division in Seiferth which had required the boy to submit to surgery, largely because it found no emergency which threatened his health or his life. While conceding that (p. 85) “ the Children’s Court has power in drastic situations to direct the operation over the objection of parents ”, the Court of Appeals, “nevertheless, [found that there] is no present emergency, [and] that time is less of the essence than it was a few years ago insofar as it concerns the physical prognosis ”. The decision was not, however, without a strong dissent[9] by Judge Fuld in which Judges Desmond and Burke concurred. •
Matter of Seiferth (309 N. Y. 80) was, moreover, decided 15 years ago in 1955 and in the light of the broad powers and “wide discretion and grave responsibilities ” (Family Ct. Act, § 141) conferred upon the Judges of this court by the enactment of the Family Court Act, it is of doubtful validity as a binding precedent upon this court in the present situation. It is now, as it was at the time Seiferth was decided, declared to be “ the policy of the state of New York to provide medical service for the treatment and rehabilitation of physically handicapped children” (Public Health Law, § 2580). Although “medical service ” as defined in subdivision 2 of section 2581 of the *671 Public Health Law does not include surgical treatment[10] section 232 of the Family Court Act which gives the Family Court jurisdiction over physically handicapped children provides that ‘ ‘ Whenever a child within the jurisdiction of the court appears to the court to be in need of medical, surgical, therapeutic, or hospital care or treatment, a suitable order may be made therefor.” (Family Ct. Act, § 232, subd. [b]; emphasis supplied.) There is no requirement in the statute that there be an emergency or danger to the child’s life before the court may act — only a requirement that the child be within the jurisdiction of the court and appear to the court to be in need. Furthermore the recent revision of article 10 of the Family Court Act which confers upon this court exclusive jurisdiction and ample authority to deal with the abused and neglected child is a clear indication of the Legislature’s concern for these unfortunate children and its intention to confer upon the court the broadest power and discretion to deal with these matters. I therefore conclude that this court’s authority to deal with the abused, neglected or physically handicapped child is not limited to “ drastic situations ” or to those which constitute a “present emergency”, but that the court has a “wide discretion” to order medical or surgical care and treatment for an infant even over parental objection, if in the court’s judgment the health, safety or welfare of the child requires it.
The question still remains, however, whether this court should, under the circumstances of this case, order this boy to undergo a risky surgical procedure, which the surgeons concede will not cure him of the disease. Dr. Hoffmeister, one of the plastic surgeons who testified in this case concedes, ‘ ‘ we would certainly leave a tumor behind. This is a non-resectable lesion ’ ’. Dr. Macomber, the other surgeon, also was frank in admitting the limitations upon the surgeon’s skill when he said: “well, you can remove — you can’t get it all, this is for sure ’ ’. Although the results of the surgery would be to change his physical appearance, Dr. Macomber conceded that ‘ ‘ he can’t be returned to a normal face, impossible ”.
Counsel for Mrs.- Sampson stresses the surgical risk involved in the contemplated procedure which the surgeons candidly concede is a “ dangerous procedure ’ ’ and involves ‘ ‘ considerable risk ” even with the use of blood transfusions. Moreover, counsel points out with much persuasiveness that Dr. Hoff *672 meister expressed the opinion that, while the contemplated surgery would still be risky, it would be less risky if the operation were delayed for five or six years, because the boy’s blood volume would then be larger and while the loss of blood would be about the same, the relative blood loss would be smaller than now.
Because of the high surgical risk inherent in the operation and the minimization of the risk as the boy grows older by reason of the lower relative blood loss to total blood supply, counsel for Mrs. Sampson and the Law Guardian counsel delay until the boy is old enough to make the decision for himself. In fact, even Dr. Hoffmeister counsels delay. He said: “I would suggest to the Court wait until the child is 21 years old and have him make his own decision because I feel we are not losing by waiting five or six years.
“ Q. In other words you feel it is not increasing the degree of risk to wait five or six years? A. I think it’s decreasing the degree of risk.
“ Q. It’s decreasing? A. Because of the blood volume we alluded to.”
From the surgeon’s point of view the fact that the surgical risk may decrease as the boy grows older is certainly a most persuasive reason for postponing the surgery., However, to postpone the surgery merely to allow the boy to become of age so that he may make the decision himself as suggested by the surgeon and urged by both counsel for the mother and the Law Guardian (Matter of Seiferth, supra), totally ignores the developmental and psychological factors stemming from his deformity which the court deems to be of the utmost importance in any consideration of the boy’s future welfare and begs the whole question.
This court cannot evade the responsibility for a decision now by the simple expedient of foisting upon this boy the responsibility for making a decision at some later day which by the time it is made, if at all, will be too late to undo the irreparable damage he will have suffered in the interim. This court plainly has a duty to perform and though the responsibility for decision is awesome the burden cannot be shared by transferring even a small part of it to another. Except for the difference in the degree of risk involved in the surgery, the words of Judge Fold dissenting in Seiferth (supra, p. 86) are an eloquent exposition of the “grave responsibilities” this court must carry and are peculiarly apposite to this case. Judge Fuld wrote (pp. 86-88): “ It would, of course, he prefer *673 able if the boy were to accede to the operation, and I am willing to assume that, if he acquiesces, he will the more easily and quickly react to the postoperative speech therapy. However, there is no assurance that he will, either next year, in five years or six, give his consent. Quite obviously, he is greatly influenced by his father, quite plainly a victim of the latter’s unfortunate delusions. And, beyond that, it must be borne in mind that there is little if any risk involved in the surgery and that, as time goes on, the operation becomes more difficult.
‘ ‘ Be that as it may, though, it is the court which has a duty to perform (Children’s Ct. Act, § 24), and it should not seek to avoid that duty by foisting upon the boy the ultimate decision to be made. Neither by statute nor decision is the child’s consent necessary or material, and we should not permit his refusal to agree, his failure to co-operate, to ruin his life and any chance for a normal, happy existence; normalcy and happiness, difficult of attainment under the most propitious conditions, will unquestionably be impossible if the disfigurement is not corrected.
“ Moreover, it is the fact, and a vital one, that this is a proceeding brought to determine whether the parents are neglecting the child by refusing and failing to provide him with necessary surgical, medical and dental service (Children’s Ct. Act, § 2, subd. 4, cl. e)[11]. Whether the child condones the neglect, whether he is willing to let his parents do as they choose, surely cannot be operative on the question as to whether or not they are guilty of neglect. They are not interested dr concerned with whether he does or does not want the essential operation. They have arbitrarily taken the position that there is to be no surgery. What these parents are doing, by their failure to provide for an operation, however well-intentioned, is far worse than beating the child or denying him food or clothing. To the boy, and his future, it makes no difference that it may be ignorance rather than viciousness that will perpetuate his unfortunate condition. If parents are actually mistreating or neglecting a child, the circumstance that he may not mind it cannot alter the fact that they are guilty of neglect and it cannot render their conduct permissible.
“ The welfare and interest of a child are at stake. A court should not place upon his shoulders one of the most momentous *674 and far-reaching decisions of his life. The court should make the decision, as the statute contemplates, and leave to the good sense and sound judgment of the public authorities the job of preparing the boy for the operation and of getting him as adjusted to it as possible. We should not put off the decision in the hope and on the chance that the child may change his mind and submit at some future time to the operation.”
It is conceded that “ there are important considerations both ways ” and that the views expressed by the dissenting Judges in Seiferth have not been universally accepted.[12] Moreover, it must also be humbly acknowledged that under the circumstances of this case ‘ ‘ one cannot be certain of being right. ’[13] (Matter of Seiferth, supra, p. 87.) Nevertheless, a decision must be made, and so, after much deliberation, I am persuaded that if this court is to meet its responsibilities to this boy it can neither shift the responsibility for the ultimate decision onto his shoulders nor can it permit his mother’s religious beliefs to stand in the way of attaining through corrective surgery whatever chance he may have for a normal, happy existence, which, to paraphrase Judge Fuld, is difficult of attainment under the most propitious circumstances, but. will unquestionably be impossible if the disfigurement is not corrected.
If the boy has any chance at all for a normal, happy existence, *675 without a disfigurement so gross as to overshadow all else in Ms life, some risk must be taken. The surgeons acknowledge that in every case of surgery performed under anesthesia there is always a risk of cardiac arrest, but as Dr. Macomber said, “ if we worried about that all the time we wouldn’t do any good for anybody.” He acknowledged: “ we know there’s a risk and they have to have surgery ”. But then he added: “ Here the risk shouldn’t be too great with blood. In other words, we ’re not working on vital organs that can go haywire, but with this, we surely, if we didn’t have blood, no one should touch him.”
Thus, while the surgeons conceded that there are risks inherent in the contemplated surgery, in their opinion that risk should not be too great if they have permission to use blood. In any event, when one considers the bleak prospect for this boy’s future of the alternative of doing nothing, it is a risk which I believe must be taken. However, this conclusion must be qualified by stating that if in the judgment of those surgeons who have been consulted concerning Kevin’s condition and who have the responsibility for the actual performance of the surgery, the contemplated procedures pose an unacceptable risk to his life, they ought not to undertake such surgery. This is a judgment that only the surgeons are qualified to make and nothing in this decision should be so construed as to require any surgeon to perform any surgery upon this boy if, in their judgment, such surgery ought not to be undertaken. The court wishes to leave the surgeons completely free to exercise their own professional judgment as to the nature, extent and timing of any surgery that may be required for the correction of Kevin’s deformity.
For the reasons heretofore expressed the court finds the mother’s- religious objections to the administration of blood transfusions untenable. It is both illogical and impractical for Mrs. Sampson to consent to surgery for her son and then for religious reasons attempt to limit or circumscribe the surgeons in the employment of their surgical skills. In passing it should be noted, however, that this is not a case in which the mother resists medical or surgical treatment for her son because of her sole reliance upon the power of God to heal, for it does not appear that either Jehovah’s Witnesses or Mrs. Sampson individually make any pretext of reliance upon divine power to heal through prayer. Consequently, since that issue is not presented, it is unnecessary to pass upon it.
Because of the refusal of Mrs. Mildred Sampson to give her consent to the blood transfusions essential for the safety *676 of the surgical procedures necessary to insure the physical, mental and emotional well-being of her son, the court adjudicates Kevin Sampson to be a neglected child within the meaning of section 1012 of the Family Court Act. This adjudication, however, in no "way imports a finding that the mother failed in her duty to the child in any other respect. (Matter of Santos v. Goldstein, 16 A D 2d 755.)
The court therefore orders that the child, Kevin Sampson, be released to the custody of his mother and pursuant to section 1054 of the Family Court Act further orders that Mrs. Mildred 'Sampson be placed under the supervision of the Commissioner of Social Services of Ulster County for the maximum period of one year upon the following terms and conditions: (a) that Mrs. Mildred Sampson co-operate with the Department of Social Services to remedy her omission to provide her son with such surgical care and treatment as may be necessary to remedy or alleviate the facial disfigurement from which he suffers; (b) report to the Department of Social Services as directed by the court or the Department of Social Services; (c) permit authorized representatives of the Department of Social Services to visit the home or any other place where the boy may be; (d) notify the Department of Social Services of any change of address or employment.
In addition, the court specifically orders and directs that the mother, Mrs. Mildred Sampson permit Kevin to undergo such surgery as, in the judgment of the Commissioner of Health of Ulster County upon the advice and recommendation of duly qualified surgeons, shall be necessary or required to remedy or correct the facial condition of neurofibromatosis or von ■ Recklinghausen’s disease from which he suffers. During the course of such surgery the surgeons are authorized to administer from time to time such blood transfusions as in their judgment may be necessary. The cost of such surgical treatment and hospital care as may be necessary shall be borne by the County óf Ulster.

. Genesis 9:3, 4

. Leviticus 3:17; 7:26, 27; 17:10-14 Deuteronomy 12:23

. I Chronicles 11:16-19 II Samuel 23:15-17

. Acts 15:28, 29; 21:25

. I 'Samuel 14:32, 33

. Leviticus 17:10

. The New York Times of July, 19, 1970, p. 6, in an article entitled “ Why there is Peril from Some Blood Donors ”, reports that “ a study carried out at the National Institutes of Health reveals that 51 percent of heart surgery patients receiving commercial blood came down with hepatitis, while those *663 receiving voluntary blood rarely did”.
See also: “ Policing the Plasma Plants ”, Time, August 17, 1970, p. 43 “ Sweating Blood ”, Time, October 17, 1970, p. 57
11 Am. Jur. Proof of Pacts 331 (1961)
15 Am. Jur. Proof of Pacts 169 (1965)
“Blood Medicine and the Law of God.” Watehtower Bible and Tract Society. (1961)

. Genesis 9:3, 4
Leviticus 3:17; 17:14 Deuteronomy 12:23 Acts 15:28, 29

. “ Every child has a right, so far as is possible, to lead a normal life and, if his parents, through viciousness or ignorance, act in such a way as to endanger that right, the courts should, as the legislature has provided, act on his behalf. Such is the case before us. * *
“ It is quite true that the child’s physical life is not at peril — as would be the situation if he had an infected appendix or a growth on the brain — but it may not be questioned, (to quote from the opinion below, ‘ What is in danger is his chance for a normal, useful life.’ ” (Dissenting opinion Judge Fuld, Matter of Seiferth, 309 N. Y. 80, 86.)

. The phrase, “surgical treatment” was eliminated from the definition of “medical service” contained in section 2581 of the Public Health Law by chapter 701 of the Laws of 1963.

. A “ Neglected child ”, the Children’s Court Act (§ 2, subd. 4) recites, “ means a child * * * (e) whose parent, guardian or custodian neglects or refuses, when able to do so, to provide necessary medical, surgical, institutional or hospital care for such child ”.

. Cf. Matter of Hudson (13 Wn. 2d 673, 700-701 [Sup. Ct., 1942] in which the Supreme Court of Washington reversed an order of a Juvenile Court which had ordered surgery for the amputation of a child’s left arm with this rebuke to judicial authority: “ However, the mere fact that the court is convinced of the necessity of subjecting a minor child to a surgical operation will not sustain a court order which deprives a parent of the responsibility and right to decide respecting the welfare of the child. No court has authority to take a minor child, over objection of its parents who have not been deprived as unfit and unsuitable persons to have custody and control of the child, and subject it to a surgical operation.”

. I am keenly aware of the moral dilemma posed by the choice between an abdication of this court’s responsibility for this boy’s health and general welfare and the seeming assumption by the court of a power many would regard as the exclusive prerogative of God alone. Matter of Hudson (13 Wn.. 2d 673) the Washington 'Supreme Court by a 5-4 decision chose the first horn of the dilemma rather than arrogate to itself such divine powers. In eschewing such powers the court said (p. 864): “ Implicit in their [the family’s] position is their opinion that it would be preferable that the child die instead of going through life handicapped by the enlarged, deformed left arm. That may be to some today the humane, and in the future it may be the generally accepted, view. However, we have not advanced or retrograded to the stage where, in the name of mercy, we may lawfully decide that one shall be deprived of life rather than continue to exist crippled or burdened with some abnormality. That right of decision is a prerogative of the Creator.”