In the Matter of MARTIN SEIFERTH, JR., an Infant, et al., Appellants. WILLIAM E. MOSHER, as Deputy Commissioner of Health for Erie County Health Department, Respondent.

Argued May 23, 1955; decided July 8, 1955.

*William G. Conable* and *Whitney W. Gilbert* for appellants.
I. New findings of fact by the Appellate Division are unsupported by the evidence. (*Matter of Vasko*, 238 App. Div. 128; *Matter of Rotkowitz*, 175 Misc. 948; *Matter of Sisson*, 152 Misc. 806; *Pierce* v. *Society of Sisters*, 268 U. S. 510; *Houghtaling* v. *Stoothoff*, 259 App. Div. 854; *Braisted* v. *Brooklyn & Rockaway Beach R. R. Co.*, 46 App. Div. 204; *Haber* v. *Paramount Ice Corp.*, 264 N. Y. 98; *Martin* v. *Martin*, 308 N. Y. 136.) II. The Appellate Division exceeded its constitutional authority in ordering an operation over the protests of the parents. (*Matter of Vasko*, 238 App. Div. 128; *People* v. *Pierson*, 176 N. Y. 201.)

*Elmer R. Weil, County Attorney* (*George M. Nelson* of counsel), for respondent. I. The new findings of fact by the Appellate Division are fully supported by the evidence. (*Matter of Vasko,* 238 App. Div. 128; *Matter of Rotkowitz,* 175 Misc. 948; *Matter of Sisson,* 152 Misc. 806; *Pierce* v. *Society of Sisters,* 268 U. S. 510; *Houghtaling* v. *Stoothoff,* 259 App. Div. 854; *Braisted* v. *Brooklyn & Rockaway Beach R. R. Co.,* 46 App. Div. 204; *Haber* v. *Paramount Ice Corp.,* 264 N. Y. 98; *Martin* v. *Martin,* 308 N. Y. 136; *Locklin* v. *Fisher,* 264 App. Div. 452.) II. The Appellate Division of the Supreme Court, in granting petitioner's order, exercised its constitutional powers despite the protests of the parents of the infant. (*Finlay* v. *Finlay,* 240 N. Y. 429; *People* v. *Pierson,* 176 N. Y. 201; *People ex rel. Herzog* v. *Morgan,* 287 N. Y. 317; *Prince* v. *Massachusetts,* 321 U. S. 158; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Buck* v. *Bell,* 274 U. S. 200.)

VAN VOORHIS, J. This is a case involving a fourteen-year-old boy with cleft palate and harelip, whose father holds strong convictions with which the boy has become imbued against medicine and surgery. This proceeding has been instituted by the deputy commissioner of the Erie County Health Department on petition to the Children's Court to have Martin declared a neglected child, and to have his custody transferred from his parents to the Commissioner of Social Welfare of Erie County for the purpose of consenting to such medical, surgical and dental services as may be necessary to rectify his condition. The medical testimony is to the effect that such cases are almost always given surgical treatment at an earlier age, and the older the patient is the less favorable are likely to be the results according to experience. The surgery recommended by the plastic surgeon called for petitioner consists of three operations: (1) repair of the harelip by bringing the split together; (2) closing the cleft or split in the rear of the palate, the boy being already too late in life to have the front part mended by surgery; and (3) repairing the front part of the palate by dental appliances. The only risk of mortality is the negligible one due to the use of anesthesia. These operations would be spaced a few months apart and six months would be expected to complete the work, two years at the outside in case of difficulty.

Petitioner's plastic surgeon declined to be precise about how detrimental it would be to the prognosis to defer this work for several years. He said: "I do not think it is emergent, that it has to be done this month or next month, but every year that goes is important to this child, yes." A year and a half has already elapsed since this testimony was taken in December, 1953.

Even after the operation, Martin will not be able to talk normally, at least not without going to a school for an extended period for concentrated speech therapy. There are certain phases of a child's life when the importance of these defects becomes of greater significance. The first is past, when children enter grade school, the next is the period of adolescence, particularly toward the close of adolescence when social interests arise in secondary school. Concerning this last, petitioner's plastic surgeon stated: "That is an extremely important period of time. That child is approaching that age where it is very important that correction, that it is very significant that correction made at this time could probably put him in a great deal better position to enter that period of life than would otherwise. Another thing which is difficult is that we have very excellent speech facilities at the Buffalo Public Schools through grade level. At secondary school level and in higher age groups speech training facilities are less satisfactory, so that it is important that it be done at this age. However, the most important thing of all is this gradually progressive with time. The earlier done, the better results. Normally the lip is repaired in early infancy, one to three years of age. Speech training would begin at school or earlier. Every year lost has been that much more lost to the boy. Each year lost continues to be lost. The time to repair is not too early." He testified that in twenty years of plastic surgery he had never encountered a child with this boy's defects who had not been operated upon at his age. Nevertheless, he testified that such an operation can be performed "from the time the child is born until he dies." In this doctor's view, the consideration bulked larger than the quality of postoperative results, that the boy's increasing social contacts required that he be made to look and to speak normally as he approached adolescence.

Everyone testified that the boy is likeable, he has a newspaper route, and his marks in school were all over 90 during the last year. However, his father did testify that recently the boy had withdrawn a little more from his fellows, although he said that " As soon as anyone contacts Martin, he is so likeable nobody is tempted to ridicule him. * * * Through his pleasantness he overcomes it."

The father testified that " If the child decides on an operation, I shall not be opposed ", and that " I want to say in a few years the child should decide for himself * * * whether to have the operation or not." The father believes in mental healing by letting " the forces of the universe work on the body ", although he denied that this is an established religion of any kind stating that it is purely his own philosophy and that " it is not classified as religion." There is no doubt, however, that the father is strong minded about this, and has inculcated a distrust and dread of surgery in the boy since childhood.

The Erie County Children's Court Judge caused the various surgical procedures to be explained to Martin by competent and qualified practitioners in the field of plastic surgery and orthodontia. Photographs of other children who had undergone similar remedial surgery were exhibited to him showing their condition both before and after treatment. He was also taken to the speech correction school where he heard the reproduction of his own voice and speech, as well as records depicting various stages of progress of other children. He met other children of his own age, talked to them and attended class in speech correction. Both the boy and the father were given opportunity to ask questions, which they did freely not only of the professional staff but of the different children.

On February 11, 1954, Martin, his father and attorney met after these demonstrations in Judge WYLEGALA's chambers. Judge WYLEGALA wrote in his opinion that Martin " was very much pleased with what was shown him, but had come to the conclusion that he should try for some time longer to close the cleft palate and the split lip himself through ' natural forces.' " After stating that an order for surgery would have been granted without hesitation if this proceeding had been instituted before this child acquired convictions of his own, Judge WYLEGALA summed up his conclusions as follows: " After duly deliberating

upon the psychological effect of surgery upon this mature, intelligent boy, schooled as he has been for all of his young years in the existence of ' forces of nature ' and his fear of surgery upon the human body, I have come to the conclusion that no order should be made at this time compelling the child to submit to surgery. His condition is not emergent and there is no serious threat to his health or life. He has time until he becomes 21 years of age to apply for financial assistance under County and State aid to physically handicapped children to have the corrections made. This has also been explained to him after he made known his decision to me.'' The petition accordingly was dismissed.

The Appellate Division, Fourth Department, reversed by a divided court, and granted the petition requiring Martin Seiferth to submit to surgery.

As everyone agrees, there are important considerations both ways. The Children's Court has power in drastic situations to direct the operation over the objection of parents (*Matter of Vasko*, 238 App. Div. 128, 129). Nevertheless, there is no present emergency, time is less of the essence than it was a few years ago insofar as concerns the physical prognosis, and we are impressed by the circumstance that in order to benefit from the operation upon the cleft palate, it will almost certainly be necessary to enlist Martin's co-operation in developing normal speech patterns through a lengthy course in concentrated speech therapy. It will be almost impossible to secure his co-operation if he continues to believe, as he does now, that it will be necessary '' to remedy the surgeon's distortion first and then go back to the primary task of healing the body.'' This is an aspect of the problem with which petitioner's plastic surgeon did not especially concern himself, for he did not attempt to view the case from the psychological viewpoint of this misguided youth. Upon the other hand, the Children's Court Judge, who saw and heard the witnesses, and arranged the conferences for the boy and his father which have been mentioned, appears to have been keenly aware of this aspect of the situation, and to have concluded that less would be lost by permitting the lapse of several more years, when the boy may make his own decision to submit to plastic surgery, than might be sacrificed if he were compelled to undergo it now against his sincere and frightened antagonism. One cannot be certain of being right under these circumstances,

but this appears to be a situation where the discretion of the trier of the facts should be preferred to that of the Appellate Division (*Harrington* v. *Harrington,* 290 N. Y. 126).

The order of the Appellate Division should be reversed and that of the Children's Court reinstated dismissing the petition, without prejudice to renew the application if circumstances warrant.

FULD, J. (dissenting). Every child has a right, so far as is possible, to lead a normal life and, if his parents, through viciousness or ignorance, act in such a way as to endanger that right, the courts should, as the legislature has provided, act on his behalf. Such is the case before us.

The boy Martin, twelve years old when this proceeding was begun, fourteen now, has been neglected in the most egregious way. He is afflicted with a massive harelip and cleft palate which not only grievously detract from his appearance but seriously impede his chances for a useful and productive life. Although medical opinion is agreed that the condition can be remedied by surgery, that it should be performed as soon as possible and that the risk involved is negligible, the father has refused to consent to the essential operation. His reason — which is, as the Appellate Division found, entirely unsubstantial — was that he relies on " forces in the universe " which will enable the child to cure himself of his own accord. He might consent to the operation, he said, if the boy " in a few years " should favor one.

It is quite true that the child's physical life is not at peril — as would be the situation if he had an infected appendix or a growth on the brain — but it may not be questioned, to quote from the opinion below, " What is in danger is his chance for a normal, useful life." Judge VAN VOORHIS does not, I am sure, take issue with that, but he feels that the boy will benefit, to a greater extent, from the operation if he enters the hospital with a mind favorably disposed to surgery. Therefore he counsels delay, on the *chance* — and that is all it is — on the *chance* that at some future time the boy may make his own decision to submit to plastic surgery.

It would, of course, be preferable if the boy were to accede to the operation, and I am willing to assume that, if he acqui-

esces, he will the more easily and quickly react to the postoperative speech therapy. However, there is no assurance that he will, either next year, in five years or six, give his consent. Quite obviously, he is greatly influenced by his father, quite plainly a victim of the latter's unfortunate delusions. And, beyond that, it must be borne in mind that there is little if any risk involved in the surgery and that, as time goes on, the operation becomes more difficult.

Be that as it may, though, it is the court which has a duty to perform (Children's Court Act, § 24), and it should not seek to avoid that duty by foisting upon the boy the ultimate decision to be made. Neither by statute nor decision is the child's consent necessary or material, and we should not permit his refusal to agree, his failure to co-operate, to ruin his life and any chance for a normal, happy existence; normalcy and happiness, difficult of attainment under the most propitious conditions, will unquestionably be impossible if the disfigurement is not corrected.

Moreover, it is the fact, and a vital one, that this is a proceeding brought to determine whether the parents are neglecting the child by refusing and failing to provide him with necessary surgical, medical and dental service (Children's Court Act, § 2, subd. 4, cl. e).[1] Whether the child condones the neglect, whether he is willing to let his parents do as they choose, surely cannot be operative on the question as to whether or not they are guilty of neglect. They are not interested or concerned with whether he does or does not want the essential operation. They have arbitrarily taken the position that there is to be no surgery. What these parents are doing, by their failure to provide for an operation, however well-intentioned, is far worse than beating the child or denying him food or clothing. To the boy, and his future, it makes no difference that it may be ignorance rather than viciousness that will perpetuate his unfortunate condition. If parents are actually mistreating or neglecting a child, the circumstance that he may not mind it cannot alter

1. A "Neglected child", the Children's Court Act (§ 2, subd. 4) recites, "means a child * * * (e) whose parent, guardian or custodian neglects or refuses, when able to do so, to provide necessary medical, surgical, institutional or hospital care for such child".

the fact that they are guilty of neglect and it cannot render their conduct permissible.

The welfare and interests of a child are at stake. A court should not place upon his shoulders one of the most momentous and far-reaching decisions of his life. The court should make the decision, as the statute contemplates, and leave to the good sense and sound judgment of the public authorities the job of preparing the boy for the operation and of getting him as adjusted to it as possible. We should not put off decision in the hope and on the chance that the child may change his mind and submit at some future time to the operation.

The order of the Appellate Division should be affirmed.

CONWAY, Ch. J., DYE and FROESSEL, JJ., concur with VAN VOORHIS, J.; FULD, J., dissents in an opinion in which DESMOND and BURKE, JJ., concur.

Order reversed, etc.