ELLA HOENER, CASE SUPERVISOR CHILD WELFARE DEPARTMENT OF BERGEN COUNTY, PLAINTIFF, v. LOUIS BERTINATO AND GLORIA BERTINATO, HIS WIFE, DEFENDANTS.

Juvenile and Domestic Relations Court
Bergen County

Decided April 27, 1961.

518

*Mr. Milton T. Lasher,* Bergen County Counsel, attorney for plaintiff.

KOLE, J. The defendants, husband and wife, are members of a religious sect known as Jehovah's Witnesses. The defendant Gloria Bertinato is pregnant by Louis Bertinato with her fourth child and is expected to give birth to the baby within the next few days. Gloria Bertinato has a blood condition known as RH negative. The undisputed medical evidence of both physicians who testified at the hearing in this matter established, beyond a reasonable doubt, that, as a result of this blood condition of the mother, unless a blood transfusion was given the child soon after birth, the child would die, or even if there were the remote possibility of its surviving, it would be born physically or mentally deformed for life.

The testimony of the physicians is supported by the history of Gloria Bertinato's former pregnancies. Her first child was born without the necessity of blood transfusions and is a normal child. This accords with the medical testimony at the hearing that the mother's RH blood condition adversely affects the second and subsequent children but rarely is harmful to the first-born.

Gloria Bertinato's second child, born in 1955, required a blood transfusion immediately after birth. Both defendants then refused on religious grounds to consent to the transfusion after the child was born. Concern by defendants'

then physicians for the child's welfare prompted the filing of a complaint at that time in this court under *N. J. S. A.* 9:2-9 to 9:2-11, inclusive. According to the affidavits of the physicians attached to the complaint in that cause, even a day's delay in performing the transfusion could be fatal to the new infant. An emergent night hearing, therefore, was held before this court, after which an order was entered granting custody to the Bergen County Child Welfare Department for the purpose of having the necessary transfusions effected. Upon the subsequent certification to the court by the physicians that the transfusions had been performed and that the child was in good health, custody of the child was then returned to its parents—the present defendants. At the hearing in the instant proceeding, both defendants admitted that that child has been and presently is normal and in good health.

Gloria Bertinato's third pregnancy resulted in a baby who admittedly also needed a blood transfusion to save its life. But defendants again refused to permit this on religious grounds. No legal proceedings were instituted to compel the transfusion. The infant died.

It is the welfare of the child which will be born within the next few days that is the subject of the present proceeding. It was initiated by a complaint of the Bergen County Child Welfare Department, under *N. J. S. A.* 9:2-9 to 9:2-11, inclusive. The complaint seeks an order awarding that Department custody of the child, when it is born, for the purpose of having the necessary blood transfusions made. It charges that the defendants, by their refusal to authorize the transfusions, are endangering the life of the unborn child and are, therefore, neglecting to provide it with proper protection, as provided in *N. J. S. A.* 9:2-9. An order to show cause why the relief prayed for should not be granted was duly served on defendants. Defendants were also afforded an opportunity to retain counsel to represent them, but they declined to do so. Pursuant to *N. J. S. A.* 9:2-10, the court ordered the Chief Probation Officer of Bergen County to

make an investigation concerning the reputation, character and ability of the Bergen County Child Welfare Department to properly care for the child. The report of this investigation was favorable.

A hearing was held at which the Child Welfare Department was represented by the County Counsel. The physicians who are and will be Gloria Bertinato's obstetrician and pediatrician, both of whom were eminently qualified, testified. As heretofore stated, they established, beyond a reasonable doubt, that, when born, the baby will have to receive blood transfusions in order to survive. Otherwise, it will die. They also testified that the transfusions, in order to be successful, should be performed as near after birth as possible; indeed, in order to reduce the severity of the baby's blood condition at birth, they intended, in accordance with established medical procedures in such cases, to induce early labor in the mother. Their testimony was based not only on their expert knowledge and opinion but also on the past history of Gloria Bertinato's other pregnancies and the blood tests they were taking from time to time of Gloria Bertinato.

Both defendants testified. They did not dispute the medical opinion as to the absolute need for the transfusions; nor did they object on the ground that the transfusions might be physically harmful to the baby. Their sole objection was on religious grounds, which I find they genuinely believe in. They testified that, as Jehovah's Witnesses, if they consented, they would be breaking the commands of their faith which prohibit any taking or injection of blood, and that the strength of their belief was such that, even if it meant that the baby could not survive without the transfusions, they would, and could, not consent thereto. They stated, however, that, if the transfusions were ordered by the court—a matter beyond their control and against their wishes—, they would nevertheless accept the child into their home as their child. They also stated that the second child born to them, who was given transfusions, is a healthy child.

There is no doubt of the defendants' good faith as to their

religious principles; nor is there any doubt as to their being good and devoted parents, except in their refusal to consent to the transfusions.

Nevertheless, I have no difficulty in finding that, by their refusal to consent to the blood transfusions, defendants are neglecting to provide the child to be born with proper protection within the meaning of *N. J. S. A.* 9:2–9.

*N. J. S. A.* 9:2–9 to 9:2–11, inclusive, grant jurisdiction to either the Superior Court or the Juvenile and Domestic Relations Court in the county where the "minor child is residing," at the suit of "any person interested in the welfare of such child," to commit the child to the care and custody of a child caring agency or other proper person, until further direction of the court, where the parents of the child, among other things, "shall neglect to provide the child with proper protection, maintenance and education." The court may proceed under the statute "in a summary manner or otherwise," but before the order of commitment is entered, it must have an investigation made by the county Chief Probation Officer into the reputation, character and ability to properly care for the child, of the person to whom custody is to be awarded.

The procedural requirements of the statute have been complied with.

This court's authority to intervene in this case to protect the child's welfare under *N. J. S. A.* 9:2–9 is further buttressed by the Juvenile Court Act itself, which grants this court express power to act, on behalf of the State, as *parens patriae* with respect to children within its jurisdiction and to protect them from neglect or injury. *N. J. S.* 2A:4–2, 2A:4–34. *Cf. Johnson v. State,* 18 *N. J.* 422, 430 (1955); *Greenspan v. Slate,* 12 *N. J.* 426, 440 (1953). Thus, *N. J. S.* 2A:4–2 provides:

"It is hereby declared to be a principle governing the law of this state that children under the jurisdiction of said court are wards of the state, * * * entitled to the protection of the state, which may intervene to safeguard them from neglect or injury * * *."

*N. J. S.* 2A:4–34 provides:

"Children under 18 years of age who appear before the Juvenile and Domestic Relations court in any capacity shall be deemed to be wards of the court, and protected accordingly."

"This *parens patriae* jurisdiction is a right of sovereignty and *imposes a duty* on the sovereignty to protect the public interest and to protect such persons with disabilities who have no rightful protector." *Johnson v. State, supra,* 18 *N. J.,* at *p.* 430. (Emphasis added)

Since the blood transfusions are required in order for the child to live, the defendants' refusal to consent thereto constitutes "neglect to provide the child with proper protection" under the statute. Failure or refusal to take necessary steps to protect a child's life is obviously neglect of the child, even if the parents have not failed in their duty to the child in other respects and even if such failure or refusal is grounded on genuine religious beliefs. The parents' constitutional freedom of religion, although accorded the greatest possible respect, must bend to the paramount interest of the State to act in order to protect the welfare of a child and its right to survive. *Cf. Greenspan v. Slate, supra,* where our Supreme Court said, 12 *N. J.,* at *p.* 140:

"There is a law of natural humanity as extensive as our race, which impels parents * * * to protect and support their helpless children."

■ Laws are made for the government of actions. While they cannot constitutionally interfere with mere religious beliefs and opinions, they may interfere with religious practices inconsistent with the peace and safety of the state— here, the protection of the lives and health of its children. *Reynolds v. United States,* 98 *U. S.* 145, 125 *L. Ed.* 244 (1879); *Mitchell v. Davis,* 205 *S. W. 2d* 812, 12 *A. L. R. 2d* 1042 (*Tex. Civ. App.* 1947); Annotation, "Failure to Provide Medical Attention For Child As Criminal Neglect," 12 *A. L. R. 2d* 1047, 1050.

As the United States Supreme Court stated in *Prince v. Commonwealth of Massachusetts,* 321 *U. S.* 158, at *pp.* 166, 170, 64 *S. Ct.* 438, at *p.* 442, 88 *L. Ed.* 645 (1944):

"The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. \* \* \* Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves."

Indeed, absence from the provisions of *N. J. S. A.* 9:2–9 to 9:2–11 of any reference to the religious beliefs of the parents points in the direction of a legislative intent that such beliefs should not legally justify what would otherwise constitute neglect under the statute. Compare *N. J. S. A.* 9:6–1.1 of the criminal neglect statute (*R. S.* 9:6–1 *et seq.*) which specifically provides that such beliefs may be urged as a defense to a charge thereunder.

Other courts have had no hesitancy in finding neglect and awarding custody to others, for the purpose of effecting blood transfusions, where parents of the same religious faith and beliefs as defendants have refused to consent to such transfusions for a child requiring the same. I am in complete accord with the reasoning and holdings of these cases. *People v. Labrenz,* 411 *Ill.* 618, 104 *N. E. 2d* 769, 30 *A. L. R. 2d* 1132 (*Sup. Ct.* 1952), *certiorari* denied 344 *U. S.* 824, 73 *S. Ct.* 24, 97 *L. Ed.* 642 (1952): *Morrison v. State,* 252 *S. W. 2d* 97 (*Mo. Ct. App.* 1952). See Annotation "Power of Public Authorities to Order Medical Care for a Child Over Objection of Parent or Custodian," 30 *A. L. R. 2d* 1138.

The present proceeding, however, presents an additional problem not involved in the foregoing cases. They were concerned with children already born. The instant matter was heard prior to the birth of the child. Does the fact that the child has not yet been born mean that *N. J. S. A.*

9:2–9 is inapplicable and the court is without jurisdiction? I think not.

The provisions of *N. J. S. A.* 9:2–9 to 9:2–11, inclusive, on a cursory reading, would seem to refer to a child who has been born. Thus, they speak of the parents "of any minor child" who shall "neglect to provide the child with proper protection, maintenance and education"; and of the institution of an action by any person interested in the welfare of "such child * * * in the county where such minor child is residing, for the purpose of having the child brought before the court, and for further relief provided by" the statute. The investigation must be made by the Chief Probation Officer of the county "in which the child may reside"; and the court may commit custody of "the child" to a proper person or a child caring society.

But there is nothing in any of these provisions which would preclude their application to an unborn child. Even the provision that the purpose of the complaint is to have the child brought before the court is satisfied by having the mother brought before the court. Moreover, the child—even if born—may be "brought before the court" for the purpose of a hearing under *N. J. S. A.* 9:2–9, without its physically being present.

 Additionally, it is now settled that an unborn child's right to life and health is entitled to legal protection, even if it is not viable. *Smith v. Brennan,* 31 *N. J.* 353 (1960). As our Supreme Court stated in that case, at *pp.* 363, 364, 367:

"Our criminal law regards an unborn child as a separate entity. See, *e. g. In re Vince,* 2 *N. J.* 443, at *page* 449 (1949) ; *State v. Siciliano,* 21 *N. J.* 249, at *page* 257 (1956). And our law of property and decedents' estates considers him in being for purposes beneficial to his interests. See, *e. g. In re Haines' Will,* 98 *N. J. Eq.* 628, at *page* 630 (*Prerog. Ct.* 1925) ; *Thelluson v. Woodford,* 4 *Ves.* 227 (*Ch.* 1798), 11 *Ves.* 112 (*H. L.* 1798). Under our Workmen's Compensation Act it has been held that a posthumous child may recover as a dependent of his deceased father, on the ground that the infant is both 'a child *in esse*' at the time of his

father's death and, when born, a 'posthumous child,' as those terms are used in *N. J. S. A.* 34:15–13, *subd.* g. *Morgan v. Susino Construction Co.*, 130 *N. J. L.* 418 (*Sup. Ct.* 1943), affirmed *o. b.*, 131 *N. J. L.* 329 (*E. & A.* 1944). And it has been widely held that an infant may bring a statutory action for the wrongful death of its father occurring before its birth.

\* \* \* \* \* \* \* \*

From the foregoing it is clear that medical authorities recognize that before birth an infant is a distinct entity, and that the law recognizes that rights which he will enjoy when born can be violated before his birth.

\* \* \* \* \* \* \* \*

And regardless of analogies to other areas of the law, justice requires that the principle be recognized that a child has a legal right to begin life with a sound mind and body.

\* \* \* \* \* \* \* \*

In addition, as we said above, medical authority recognizes that an unborn child is a distinct biological entity from the time of conception, and many branches of the law afford the unborn child protection throughout the period of gestation. The most important consideration, however, is that the viability distinction has no relevance to the injustice of denying recovery for harm which can be proved to have resulted from the wrongful act of another. Whether viable or not at the time of the injury, the child sustains the same \* \* \* opportunity for redress."

Finally, the history of the mother's former pregnancies makes it evident that the relief sought should be granted prior to the baby's birth. An interpretation of the statute which would require an emergency court hearing after birth in every case—as was held in connection with the second baby in 1955—does not comport with good sense.

I conclude, therefore, that the statute is applicable to the instant case even though the child is not yet born.

An order will be entered granting to the Bergen County Child Welfare Department custody of the child, when born, with authority to consent to the necessary blood transfusions. If and when the child's health and circumstances warrant, in view of the defendants' expressed desire to receive the child in their home, and their other good qualities as parents, a further order may be entered terminating such custody and returning the child to the custody of defendants.