## Green Case.

Argued September 13, 1971. Before Wright, P. J., Watkins, Montgomery, Jacobs, Hoffman, Spaulding, and Cercone, JJ.

*Michael Minkin,* Assistant Attorney General, with him *Dante Mattioni,* Deputy Attorney General, and *J. Shane Creamer,* Attorney General, for appellant.

*Elliot B. Platt,* with him *Harvey N. Schmidt,* for appellee.

OPINION BY SPAULDING, J., December 14, 1971:

Ricky Ricardo Green is the 16 year old son of separated parents, Nathaniel and Ruth Green. Mr. Green pays support as directed by court order, and the child lives with his mother, the appellee. Ricky has had two attacks of poliomyelitis, resulting in his present physical ailments: residual poliomyelitis with weakness of all four extremities and trunk muscles, severe obesity, and paralytic scoliosis secondary to muscle paralysis (a curvature of the spine). As a result of these progressively worsening conditions, the child has become bedridden. He is presently a "sitter", unable to stand or ambulate due to the collapse of his spine.[1]

A spinal fusion was recommended in 1968 by Dr. Donald A. Nagel, then chief of the spine service at the State Hospital for Crippled Children at Elizabethtown, Pennsylvania. This recommendation was reiterated by both doctors who testified at the hearing be-

---

[1] Curvature presently measures 94° which severely cramps and depresses the capacity of his lung and cardiac systems.

low, Robert W. Saunderson, Jr., M.D., Director of the State Hospital (appellant in this action), and Oscar Corn, M. D., acting head of the Division of Orthopedic Surgery at Hahnemann Medical College and Hospital, and spine consultant to the State Hospital. The doctors agreed that if Ricky's present condition is not remedied by surgery, the effect will be a further deterioration, so that eventually he will not be able to sit up and will become a complete invalid. Their testimony further indicated that the proposed operation was necessary for Ricky's physical well-being, and was the only way to preserve for him some chance of a normal life.

Dr. Corn testified that in order to undertake the recommended operation permission for a blood transfusion is a necessity. He stated that any major surgery necessarily involves some danger, and that blood transfusions in and of themselves entail some danger. However, Dr. Corn further indicated that all precautions are taken to minimize the medically acceptable risks, and that the State Hospital has had great success with surgery of this type.[2]

Mrs. Green is a Jehovah's Witness. She has no objection to the operation (R. 25a), but feels strongly that her religious principles prohibit any blood transfusions[3] (R. 25a-26a), which are necessary for surgery.

---

[2] In *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 625, 104 N.E. 2d 769, 773 (1952), *cert. denied*, 344 U.S. 824 (1952), the Court noted that blood transfusions in and of themselves have "only such attendant risk as is inescapable in all of the affairs of life". On this basis they distinguished *In re Tuttendario*, 21 Pa. Dist. 561 (Phila. Quarter Sess. 1912), which dealt with operations involving "substantial risk of life".

[3] Several other witnesses also testified as to the religious beliefs of the Jehovah's Witnesses and why they prohibited the transfusions. (R. 26a to R. 30a). See also the excellent review of these beliefs as they relate to blood transfusions in *In re Sampson*, 317 N.Y.S. 2d 641, at 645-646 (Family Court 1970).

This caused appellant to file a petition to be appointed guardian so that he could consent to the blood transfusions. The petition was dismissed by Judge Hazel H. BROWN of the Court of Common Pleas of Philadelphia County, Family Division, from which decision this appeal was promptly taken.

This action was brought by appellant under the Juvenile Court Law, Act of June 2, 1933, P.L. 1433, §1, as amended, 11 P.S. §243 et seq. (1965), which provides that the court may "[c]ommit a child to the care, guidance and control of some reputable citizen" if the child is neglected, and such action is in his best interests and welfare. 11 P.S. §250. A "neglected child" is defined as including: "A child whose parent . . . neglects or refuses to provide proper or necessary subsistence, education, *medical or surgical care, or other care necessary for his or her health,* morals or well-being." (Emphasis added.) 11 P.S. §243(5)(c). The court below correctly concluded that "[i]n the opinion of two eminent physicians, the medical care which they advise is both *proper and necessary for the child's health.*" (Emphasis added.) R. 33a. The court implicitly adopted this uncontradicted testimony indicating that the statutory standard for showing neglect has been met. However, despite this finding, the hearing judge refused to appoint appellant guardian so that he could consent to the necessary transfusion. Her opinion states that to allow the transfusion would be contrary to the religious faith of the mother, and while the operation would improve the health of the child, this was not an emergency situation. On this basis she refused to appoint a guardian.

---

In order to get around Mrs. Green's objections, the attending physician offered to draw Ricky's own blood so that they could then use it during the operation. However, this too was unacceptable to Mrs. Green as violative of her religious beliefs.

This case places before the appellate courts of Pennsylvania another of the many conflicts between the exercise of First Amendment rights by Jehovah's Witnesses and the Commonwealth's police power to safeguard the welfare of its citizens. The First Amendment of the United States Constitution, as applied to the States by the Fourteenth Amendment, provides that the States shall not limit the free exercise of religion. However, the free exercise clause does not guarantee parents complete control, free of all State authority, merely because the parent asserts that his control is based on religion. *Prince v. Massachusetts*, 321 U.S. 158 (1944), sets out the often quoted definitive statement of law in this area: "But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. [Citations omitted.] And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control . . . . Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience . . . . The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health . . . . 321 U.S. at 166-167." The court below determined that the mother's exercise of control here would undoubtedly expose the child to progressively worsening ill health, but it still refused to assert the State's power by finding the child neglected.

Under the Juvenile Court Law, the courts of this Commonwealth can order the appointment of a guardian for a child where the natural parents refuse to provide necessary medical care. See *Marsh's Case*, 140 Pa. Superior Ct. 472, 14 A. 2d 368 (1940). Further,

several jurisdictions have recognized that the courts have the power and duty to authorize the use of blood transfusions necessary for the immediate preservation of the life of a child, despite the religious objections of the parents. *Jehovah's Witnesses in the State of Washington v. King County Hospital Unit No. 1*, 278 F. Supp. 488 (W.D. Wash. 1967); *State v. Perricone*, 37 N.J. 463, 181 A. 2d 751 (1962), *cert. denied*, 371 U.S. 890 (1962); *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 104 N.E. 2d 769 (1952), *cert. denied*, 344 U.S. 824 (1952).[4] The question here, however, is whether the State's interest in the health and welfare of this child is sufficient to overcome the religious objections of the parents where no immediate threat to life exists.

*In re Sampson*, 317 N.Y.S. 2d 641 (Fam. Ct. 1970), recently answered this question in the affirmative in an almost identical situation. The case involved a 15 year old boy who required an admittedly dangerous operation for the partial correction of a facial deformity. His mother was a Jehovah's Witness and opposed the necessary blood transfusions. The court held that despite the fact that there was no immediate threat to the child's life, the operation would be less risky and of more benefit if performed immediately. Therefore, it found the boy neglected within the meaning of the New York Family Court Act, which is very similar to our statute. After reviewing the decisions involving emergency situations, the court concluded

---

[4] See also those cases involving emergency situations where transfusions were ordered for adults who objected on religious grounds: *Application of the President and Directors of Georgetown College*, 331 F. 2d 1000 (D.C. Cir. 1964), *cert. denied sub. nom.*, *Jones v. President and Directors of Georgetown College, Inc.*, 377 U.S. 978 (1964); *Raleigh-Fitkin-Paul Morgan Memorial Hospital v. Anderson*, 42 N.J. 421, 201 A. 2d 537 (1964), *cert. denied*, 377 U.S. 985 (1964).

that: "[A]lthough the mother's religious objections to the administration of a blood transfusion . . . is founded upon the scriptures and is sincerely held, it must give way before the state's paramount duty to insure his right to live and grow up without disfigurement—the right to live and grow up with a sound mind and body. 'Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves.' (Prince v. Massachusetts, 321 U.S. 158, 170, 64 S. Ct. 438, 444, 88 L. Ed. 645)." 317 N.Y.S. at 652. The same is true here, especially in view of the fact that the proposed operation is not categorized as peculiarly "dangerous".

Therefore, since his mother refuses to allow the surgery necessary for his health and well-being, we hold that Ricky Ricardo Green is neglected under the Juvenile Court Law, supra.[5]

The order of the court below is reversed and the case is remanded for the appointment of a guardian consistent with this opinion, to provide necessary medical or surgical care.

---

[5] We in no way import that this mother failed in her duty to the child in any other respect.