Green Appeal.

339

Argued April 25, 1972. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

*Elliot B. Platt,* for appellant.

*Michael Minkin,* Assistant Attorney General, with him *Dante Mattioni,* Deputy Attorney General, and *J. Shane Creamer,* Attorney General, for appellee.

Opinion by Mr. Chief Justice Jones, June 28, 1972:

The Director of the State Hospital for Crippled Children at Elizabethtown, Pennsylvania, filed a "petition to initiate juvenile proceedings" under The Juvenile Court Law, Act of June 2, 1933, P. L. 1433, §1

*et seq., as amended,* 11 P.S. §243 *et seq.,* which sought a judicial declaration that Ricky Ricardo Green (hereinafter "Ricky") was a "neglected child" within the meaning of the Act and the appointment of a guardian. After an evidentiary hearing, the Court of Common Pleas, Family Court Division, Juvenile Branch, of Philadelphia, dismissed the petition. On appeal, the Superior Court unanimously reversed and remanded the matter for the appointment of a guardian. *Green Case,* 220 Pa. Superior Ct. 191, 286 A. 2d 681 (1971). We granted allocatur.

Ricky was born on September 10, 1955, to Nathaniel and Ruth Green. He lives with his mother as his parents are separated and the father pays support pursuant to a court order. Ricky has had two attacks of poliomyelitis which have generated problems of obesity and, in addition, Ricky now suffers from paralytic scoliosis (94% curvature of the spine).

Due to this curvature of the spine Ricky is presently a "sitter", unable to stand or ambulate due to the collapse of his spine; if nothing is done, Ricky could become a bed patient. Doctors have recommended a "spinal fusion" to relieve Ricky's bent position, which would involve moving bone from Ricky's pelvis to his spine. Although an orthopedic specialist testified, "there is no question that there is danger in this type of operation", the mother did consent conditionally to the surgery. The condition is that, since the mother is a Jehovah's Witness who believes that the Bible proscribes any blood transfusions which would be necessary for this surgery,[1] she would not consent to any blood transfusions. Initially, we must recognize that, while the operation would be beneficial, there is no evidence that Ricky's life is in danger or that the operation must

---

[1] The mother also rejected the suggestion that Ricky's own blood, obtained by periodic bleeding, be employed.

be performed immediately. Accordingly, we are faced with the situation of a parent who will not consent to a dangerous operation on her minor son requiring blood transfusions solely because of her religious beliefs.

By statute, a "neglected child"—"a child whose parent . . . neglects or refuses to provide proper or necessary medical or surgical care"[2]—may be committed "to the care, guidance and control of some respectable citizen of good moral character. . . ."[3] appointed by the court. The guardian appointed by the court may, with the court's approval, commit the child to a "crippled children's home or orthopaedic hospital or other institution" for treatment.[4] Thus, it has been held that a child whose parent views smallpox vaccination as "harmful and injurious" may be considered a "neglected child". *Marsh's Case*, 140 Pa. Superior Ct. 472, 14 A. 2d 368 (1940). *Cf., In re Rinker*, 180 Pa. Superior Ct. 143, 117 A. 2d 780 (1955). On the other hand, *In re Tuttendario*, 21 Pa. Dist. 561 (Q.S. Phila. 1912), held that surgery on a seven-year-old male to cure rachitis would not be ordered over the parents' refusal due to fear of the operation. While these statutes could be construed to cover the facts of this appeal, we cannot accept the Commonwealth's construction if it abridges the Free Exercise clause of the First Amendment.

Almost a century ago, the United States Supreme Court enunciated the twofold concept of the Free Exercise clause: "Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."

---

[2] The Juvenile Court Law, Act of June 2, 1933, P. L. 1433, §1(5)(c), *as amended*, 11 P.S. §243(5)(c).

[3] The Juvenile Court Law, Act of June 2, 1933, P. L. 1433, §8(b), *as amended*, 11 P.S. §250(b).

[4] Act of June 7, 1923, P. L. 677, §1, 11 P.S. §871.

*Reynolds v. United States,* 98 U.S. 145, 166 (1878). *Accord, Braunfeld v. Brown,* 366 U.S. 599 (1961); *Cantwell v. Connecticut,* 310 U.S. 296, 303-04 (1940); *Davis v. Beason,* 133 U.S. 333 (1890). Thus, it was stated in *Prince v. Massachusetts,* 321 U.S. 158, 166-67 (1944): "But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. Reynolds v. United States, 98 U.S. 145; Davis v. Beason, 133 U.S. 333. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance [footnote omitted], regulating or prohibiting the child's labor [footnote omitted] and in many other ways [footnote omitted]. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds [footnote omitted]. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death. People v. Pierson, 176 N.Y. 201, 68 N.E. 243 [footnote omitted]. The catalogue need not be lengthened. It is sufficient to show what indeed appellant hardly disputes, that the state has a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and that this includes, to some extent, matters of conscience and religious conviction." On the other hand, the United States Supreme Court recently stated, "to agree that religiously grounded conduct must often be subject to the broad police power of the State is not to deny that there are areas of conduct protected by the Free Exercise Clause of the First Amendment and thus beyond

the power of the State to control, even under regulations of general applicability." *Wisconsin v. Yoder,* 406 U.S. 205, 220 (1972) "The conduct or actions so regulated have invariably posed some substantial threat to public safety, peace or order." *Sherbert v. Verner,* 374 U.S. 398, 403 (1963). Without appearing callous, Ricky's unfortunate condition, unlike polygamy, vaccination, child labor and the like, does not pose a substantial threat to society; in this fashion, *Pierce* and its progeny are readily distinguishable.

When dealing with *adults* requiring medical attention who voice religious objections, other jurisdictions have come to varying conclusions depending, in large measure, upon the facts of each case. *See, generally,* Annot., 9 A.L.R. 3d 1391 (1966). Some courts have found medical treatment to be properly ordered by the public authority despite the adult's religious beliefs when his or her life hangs in the balance. Thus, it was held in *Application of President & Directors of Georgetown College, Inc.,* 331 F. 2d 1000 (C.A.D.C. 1964), *rehearing denied,* 331 F. 2d 1010, *cert. denied,* 377 U.S. 978 (1964), that a blood transfusion could be ordered for an adult Jehovah's Witness whose life was immediately endangered. While a similar result was reached in *United States v. George,* 239 F. Supp. 752 (D.C. Conn. 1965), that court dissolved the order several days later when the patient was no longer *in extremis* and could decide whether to allow further necessary transfusions. The Supreme Court of New Jersey likewise ordered blood transfusions for a pregnant Jehovah's Witness in order to save the life of the mother and unborn child. *Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson,* 42 N.J. 421, 201 A. 2d 537, *cert. denied,* 377 U.S. 985 (1964). *Cf., Collins v. Davis,* 44 Misc. 2d 622, 254 N.Y.S. 2d 666 (1964). On the other hand, the Illinois Supreme Court reversed an ordered

blood transfusion where the emergency patient had no children and notified the doctor beforehand that blood transfusions violated her religious beliefs. *In re Brooks' Estate,* 32 Ill. 2d 361, 205 N.E. 2d 435 (1965). *See, also, Nemser Petition,* 51 Misc. 2d 616, 273 N.Y.S. 2d 624 (1966); *Erickson v. Dilgard,* 44 Misc. 2d 27, 252 N.Y.S. 2d 705 (1962).

Turning to the situation where an adult refuses to consent to blood transfusions necessary to save the life of his infant son or daughter, other jurisdictions have uniformly held that the state can order such blood transfusions over the parents' religious objections. *People ex rel. Wallace v. Labrenz,* 411 Ill. 618, 104 N.E. 2d 769 (1952); *Morrison v. State,* 252 S.W. 2d 97 (C. A. Kansas City, Mo., 1952); *State v. Perricone,* 37 N.J. 463, 181 A. 2d 751 (1962); *Hoener v. Bertinato,* 67 N.J. Super. 517, 171 A. 2d 140 (1961); *Santos v. Goldstein,* 16 A.D. 2d 755, 227 N.Y.S. 2d 450 (1962), *appeal dismissed,* 232 N.Y.S. 2d 1026 (1962); *Application of Brooklyn Hospital,* 45 Misc. 2d 914, 258 N.Y.S. 2d 621 (1965); *In re Clark,* 21 Ohio Op. 2d 86, 185 N.E. 2d 128 (C.P. Lucas 1962). *Cf., Mitchell v. Davis,* 205 S.W. 2d 812 (Texas C.C.A. 1947). *See, generally,* Annot., 30 A.L.R. 2d 1138 (1953). The fact that the child was over twenty-one made no difference to the New Jersey Supreme Court in *John F. Kennedy Memorial Hospital v. Heston,* 58 N.J. 576, 279 A. 2d 670 (1971), which ignored the mother's religious objections.

In a somewhat different posture, the United States District Court for the Western District of Washington entertained a class action brought on behalf of all Jehovah's Witnesses in the State against certain physicians and hospitals in that State. The relief requested was a declaration that a "dependent child" statute similar to our own was unconstitutionally applied to sustain blood transfusions for children of Jehovah's Wit-

nesses where the blood transfusion "was or would be vital to save the life of the patient." *Jehovah's Witnesses in State of Washington v. King County Hospital,* 278 F. Supp. 488, 503 n.10 (W.D. Wash. 1967). Relying on *Prince v. Massachusetts,* 321 U.S. 158 (1944), that court held that the statute in question was constitutionally valid. On appeal, the United States Supreme Court, citing the *Prince* opinion, affirmed *per curiam,* 390 U.S. 598 (1968). Because the *Washington* case directly contested the constitutional application of the state statute in the situation *where the children's lives were in imminent danger,* we do not consider this Court to be bound by the Supreme Court's *per curiam* affirmance under the factual posture in the case at bar.

In our view, the penultimate question presented by this appeal is whether the state may interfere with a parent's control over his or her child in order to enhance the child's physical well-being when the child's life is in no immediate danger and when the state's intrusion conflicts with the parent's religious beliefs. Stated differently, does the State have an interest of sufficient magnitude to warrant the abridgment of a parent's right to freely practice his or her religion when those beliefs preclude medical treatment of a son or daughter whose life is not in immediate danger? We are not confronted with a life or death situation as in the cases cited earlier in this opinion. Nor is there any question in the case at bar of a parent's omission or neglect for non-religious reasons. *Compare, Heinemann's Appeal,* 96 Pa. 112 (1880), *with, In re Hudson,* 13 Wash. 2d 673, 126 P. 2d 765 (1942).

In the very recent *Yoder* decision, the United States Supreme Court ruled that the Free Exercise clause barred the application of a compulsory education statute to members of the Amish sect. While skirting the precise issue before this Court, the Supreme Court did

state, "[t]o be sure, the power of the parent, even when linked to a free exercise claim, *may* be subject to limitation under *Prince* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." U.S. at 233-34 (emphasis added). Although the use of the word "may" arguably supports the Commonwealth's position in this case, the only analogous case cited by both Mr. Chief Justice BURGER, 406 U.S. at 230 n.20, and Mr. Justice STEWART, 406 U.S. at 239 n.1 (concurring opinion), in support of this proposition is the *Georgetown College* case,[5] which is readily distinguished as a life or death situation involving an adult. For this reason, the Commonwealth is not aided by the *Yoder* opinion. Indeed, the broad holding of *Yoder* that the State's interest in the education of its children must fall before a parent's religious beliefs lend support to the mother's position.

Our research discloses only two opinions on point; both are from the New York Court of Appeals but the results differ. In *Matter of Seiferth,* 309 N.Y. 80, 127 N.E. 2d 820 (1955), the State of New York sought the appointment of a guardian for a "neglected child," a fourteen-year-old boy with a cleft palate and harelip. The father's purely personal philosophy, "not classified as religion," precluded any and all surgery as he believed in mental healing; moreover, the father had "inculcated a distrust and dread of surgery in the boy since childhood." 309 N.Y. at 84, 127 N.E. 2d at 822. The boy was medically advised and the Children's Court judge interviewed both the boy and his father in cham-

---

[5] The other cited opinions clearly involved substantial threats to society: *Cleveland v. United States,* 329 U.S. 14 (1946) (polygamy); *Prince v. Massachusetts,* 321 U.S. 158 (1944) (child labor laws); *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) (compulsory vaccination); *Wright v. DeWitt School District,* 238 Ark. 906, 385 S.W. 2d 644 (1965) (compulsory vaccination).

bers. The trial judge concluded that the operation should not be performed until the boy agreed. After reversal by the Appellate Division, Fourth Department, the Court of Appeals, by a four-to-three vote, reinstated the order of the Children's Court. The primary thrust of the opinion was the child's antagonism to the operation and the need for the boy's cooperation for treatment; since the Children's Court judge saw and heard the parties involved and was aware of this aspect, the Court of Appeals decided that the discretion of the Children's Court judge should be affirmed.

On facts virtually identical to this appeal, the Family Court of Ulster County ordered a blood transfusion in *In re Sampson,* 65 Misc. 2d 658, 317 N.Y.S. 2d 641 (1970). Kevin Sampson, fifteen years old, suffered from Von Recklinghauson's disease which caused a massive disfigurement of the right side of his face and neck. While the incurable disease posed no immediate threat to his life, the dangerous surgery requiring blood transfusions would improve "not only the function but the appearance" of his face and neck. It should also be noted that all physicians involved counselled delay until the boy was old enough to decide since the surgical risk would decrease as the boy grew older. The Family Court judge ruled in an extensive opinion that the State's interest in the child's health was paramount to the mother's religious beliefs. That court further decided not to place this difficult decision on the boy and to order an immediate operation, thereby preventing psychological problems. On appeal, the Appellate Division, Third Department, unanimously affirmed the order in a memorandum decision. *In re Sampson,* 37 A.D. 2d 688, 323 N.Y.S. 2d 253 (1971). That court rejected the argument that "State intervention is permitted only where the life of the child is in danger by a failure to act . . . [as] a much too restricted approach." 37 A.D. 2d at 669, 323 N.Y.S. 2d at 255. When the matter reached the Court

of Appeals, *In re Sampson,* 29 N.Y. 2d 900, 278 N.E. 2d 918 (1972), that Court affirmed *per curiam* the opinion of the Family Court but added two observations: (1) the *Seiferth* opinion turned upon the question of a court's discretion and not the existence of its power to order surgery in a non-fatal case, and (2) religious objections to blood transfusions do not "present a bar at least where the transfusion is necessary to the success of the required surgery," 29 N.Y. 2d at 901, 278 N.E. 2d at 919.

With all deference to the New York Court of Appeals, we disagree with the second observation in a non-fatal situation and express no view of the propriety of that statement in a life or death situation. If we were to describe this surgery as "required", like the Court of Appeals, our decision would conflict with the mother's religious beliefs. Aside from religious considerations, one can also question the use of that adjective on medical grounds since an orthopedic specialist testified that the operation itself was dangerous. Indeed, one can question who, other than the Creator, has the right to term certain surgery as "required". This fatal/non-fatal distinction also steers the courts of this Commonwealth away from a medical and philosophical morass: if spinal surgery can be ordered, what about a hernia or gall bladder operation or a hysterectomy? The problems created by *Sampson* are endless. We are of the opinion that as between a parent and the state, the state does not have an interest of sufficient magnitude outweighing a parent's religious beliefs when the child's life is *not immediately imperiled* by his physical condition.

Unlike *Yoder* and *Sampson,* our inquiry does not end at this point since we believe the wishes of this sixteen-year-old boy should be ascertained; the ultimate question, in our view, is whether a parent's religious

beliefs are paramount to the possibly adverse decision of the child. In *Yoder*, Mr. Justice DOUGLAS, dissenting in part, wanted to remand the matter in order to determine whether the Amish children wished to continue their education in spite of their parents' beliefs: "if an Amish child desires to attend high school, and is mature enough to have that desire respected, the State may well be able to override the parents' religiously motivated objections." 406 U.S. at 242. The majority opinion as well as the concurring opinion of Mr. Justice STEWART did not think it wise to reach this point for two principal reasons: (1) it was the parents, not the children, who were criminally prosecuted for their religious beliefs; and (2) the record did not indicate a parent-child conflict as the testimony of the lone child witness coincided with her parents' religious beliefs. While the record before us gives no indication of Ricky's thinking, it is the child rather than the parent in this appeal who is directly involved which thereby distinguishes *Yoder's* decision not to discuss the beliefs of the parents vis-a-vis the children. In *Sampson*, the Family Court judge decided not to "evade the responsibility for a decision now by the simple expedient of foisting upon this boy the responsibility for making a decision at some later date. . . ." 65 Misc. 2d at 672, 317 N.Y.S. 2d at 655. While we are cognizant of the realistic problems of this approach enunciated by Judge (now Chief Judge) FULD in his *Seiferth* dissent, we believe that Ricky should be heard.

It would be most anomalous to ignore Ricky in this situation when we consider the preference of an intelligent child of sufficient maturity in determining custody. *E.g., Snellgrose Adoption Case*, 432 Pa. 158, 247 A. 2d 596 (1968). Moreover, we have held that a child of the same age can waive constitutional rights and receive a life sentence. *E.g., Com. v. Moses*, 446 Pa.

350, 287 A. 2d 131 (1971). Indeed, minors can now bring a personal injury action in Pennsylvania against their parents. *Falco v. Pados,* 444 Pa. 372, 282 A. 2d 351 (1971). We need not extend this litany of the rights of children any further to support the proposition that Ricky should be heard. The record before us does not even note whether Ricky is a Jehovah's Witness or plans to become one. We shall, therefore, reserve any decision regarding a possible parent-child conflict and remand the matter for an evidentiary hearing similar to the one conducted in *Seiferth* in order to determine Ricky's wishes.

The order of the Superior Court is reversed and the matter remanded to the Court of Common Pleas of Philadelphia, Family Court Division, Juvenile Branch, for proceedings consistent with the views expressed in this opinion. In the meantime, awaiting the evidentiary hearing and result thereof, we will retain our jurisdiction in this matter.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

With all due deference to the majority of this Court, I am compelled to dissent. I would affirm the order of the Superior Court.

The Court's analysis presumes there are two primary interests at stake, that of the State to protect its citizens and that of the mother to follow her religious convictions. The difficulty, and what I believe to be the fatal flaw in this reasoning, is that too little consideration and attention is given to the interests of the health and well-being of this young boy. Although the mother's religious beliefs must be given the fullest protection and respect, I do not believe the mother's religious convictions should be our primary consideration. As Mr. Justice RUTLEDGE aptly stated: "Parents may be free to become martyrs themselves. But it does not

follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." *Prince v. Massachusetts,* 321 U.S. 158, 170, 64 S. Ct. 438, 444 (1944).

The reasoning of Judge SPAULDING, who delivered the opinion of the Superior Court, more than adequately expresses what I believe to be the correct and salutory approach to this situation and I take the liberty of quoting from his opinion: "This case places before the appellate courts of Pennsylvania another of the many conflicts between the exercise of First Amendment rights by Jehovah's Witnesses and the Commonwealth's police power to safeguard the welfare of its citizens. The First Amendment of the United States Constitution, as applied to the States by the Fourteenth Amendment, provides that the States shall not limit the free exercise of religion. However, the free exercise clause does not guarantee parents complete control, free of all State authority, merely because the parent asserts that his control is based on religion. Prince v. Massachusetts, 321 U.S. 158 (1944), sets out the often quoted definitive statement of law in this area: 'But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. [Citations omitted.] And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control. . . . Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. . . . The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health. . . . 321 U.S. at 166-167.' The court below determined that the mother's exercise of

control here would undoubtedly expose the child to progressively worsening ill health, but it still refused to assert the State's power by finding the child neglected.

"Under the Juvenile Court Law, the courts of this Commonwealth can order the appointment of a guardian for a child where the natural parents refuse to provide necessary medical care. See Marsh's Case, 140 Pa. Superior Ct. 472, 14 A. 2d 368 (1940). Further, several jurisdictions have recognized that the courts have the power and duty to authorize the use of blood transfusions necessary for the immediate preservation of the life of a child, despite the religious objections of the parents. Jehovah's Witnesses in the State of Washington v. King County Hospital Unit No. 1, 278 F. Supp. 488 (W.D. Wash. 1967); State v. Perricone, 37 N.J. 463, 181 A. 2d 751 (1962), cert. denied, 371 U.S. 890 (1962); People ex rel. Wallace v. Labrenz, 411 Ill. 618, 104 N.E. 2d 769 (1952), cert. denied, 344 U.S. 824 (1952). The question here, however, is whether the State's interest in the health and welfare of this child is sufficient to overcome the religious objections of the parents where no immediate threat to life exists.

"In re Sampson, 317 N.Y.S. 2d 641 (Fam. Ct. 1970), recently answered this question in the affirmative in an almost identical situation. The case involved a 15-year-old boy who required an admittedly dangerous operation for the partial correction of a facial deformity. His mother was a Jehovah's Witness and opposed the necessary blood transfusions. The court held that despite the fact that there was no immediate threat to the child's life, the operation would be less risky and of more benefit if performed immediately. Therefore, it found the boy neglected within the meaning of the New York Family Court Act, which is very similar to our statute. After reviewing the decisions involving

emergency situations, the court concluded that: '[A]lthough the mother's religious objections to the administration of a blood transfusion . . . is finished upon the scriptures and is sincerely held, it must give way before the state's paramount duty to insure his right to live and grow up without disfigurement—the right to live and grow up with a sound mind and body. "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." (Prince v. Massachusetts, 321 U.S. 158, 170, 64 S. Ct. 438, 444, 88 L. Ed. 645).' 317 N.Y.S. at 652. The same is true here, especially in view of the fact that the proposed operation is not categorized as peculiarly 'dangerous'." 220 Pa. Superior Ct. 191, 195-97, 286 A. 2d 681, 683-84 (1971). With the approach of the Superior Court and the *Sampson* court, I wholeheartedly agree.

The majority takes the approach that the broad holding of *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972), supports the position of the mother. However, I do not read *Yoder* as having any bearing on this case, and if it has any, it would support the position the boy should have the operation. The Court used the following language which I believe indicates *Yoder* is not involved: "This case, of course, is not one in which *any harm to the physical or mental health of the child* or to the public safety, peace, order, or welfare has been demonstrated or may be properly inferred. The record is to the contrary, and any reliance on that theory [Prince] would find no support in the evidence." [Emphasis supplied.] Id. at 230, 92 S. Ct. at 1540-41. Moreover, the following language supports the position that the boy should have the operation: "To be sure, the power of the parent, even when linked to a free

exercise claim, may be subject to limitation under Prince if it appears *that the parental decisions will jeopardize the health* or safety of the child, or have a potential for significant social burdens." (Emphasis supplied.) Id. at 233-234, 92 S. Ct. 1542.

Furthermore, I believe one of the prime considerations in *Yoder* was the effect of compulsory education on the religious beliefs of the children,[1] this is absent in the present case. Our sole consideration with respect to the child should be his health, a consideration not present in *Yoder*.

I also do not agree with the emphasis the majority places on the fact this is not a life or death situation. The statute with which we are dealing (Juvenile Court Law, Act of June 2, 1933, P. L. 1433, §1, as amended, 11 P.S. §243 et seq.) does not contain any such language, nor do I find support for this position in the case law (note the use of the word health in the *Yoder* and *Prince* opinions). The statute in pertinent part states: "A child whose parent . . . neglects or refuses to provide *proper or necessary* subsistence, education, *medical or surgical care, or other care necessary for his or her health. . . .*" (Emphasis supplied.) 11 P.S. §243 (5) (c).

The statute only speaks in terms of "health", not life or death. If there is a substantial threat to health, then I believe the courts can and should intervene to protect Ricky. By the decision of this Court today, this

---

[1] The *Yoder* Court stated: "Indeed it seems clear that if the State is empowered, as *parens patriae*, to 'save' a child from himself or his Amish parents by requiring an additional two years of compulsory formal high school education, the State will in large measure influence, if not determine, the religious future of the child. Even more markedly than in *Prince*, therefore, this case involves the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." U.S. at 232, 92 S. Ct. at 1541.

boy may never enjoy any semblance of a normal life which the vast majority of our society has come to enjoy and cherish.

Lastly, I must take issue with the manner in which the majority finally disposes of the case. I do not believe that sending the case back to allow Ricky to be heard is an adequate solution. We are herein dealing with a young boy who has been crippled most of his life, consequently, he has been under the direct control and guidance of his parents for that time. To now presume that he could make an independent decision as to what is best for his welfare and health is not reasonable. See *In Matter of Seiferth*, 309 N.Y. 80, 86, 127 N.E. 2d 820, 823 (1955) (dissenting opinion, FULD, J.). Moreover, the mandate of the Court presents this youth with a most painful choice between the wishes of his parents and their religious convictions on the one hand, and his chance for a normal, healthy life on the other hand. We should not confront him with this dilemma.

On the basis of the foregoing, I would affirm the Order of the Superior Court.

Mr. Justice ROBERTS and Mr. Justice POMEROY join in this dissent.