THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v ANDRE SUKRAM, Defendant.

District Court of Nassau County, First District, March 13, 1989

### APPEARANCES OF COUNSEL

*Denis Dillon, District Attorney (Edward King* of counsel), for plaintiff. *Charles Hochbaum* for defendant.

### OPINION OF THE COURT

B. MARC MOGIL, J.

This court *sua sponte* amends by addition its oral decision made from the Bench after a *Huntley* hearing held January 19, 1989 *(People v Huntley,* 15 NY2d 72).

The court has considered the issue, tangentially raised, as to whether the State can revoke the driver's license of a defendant who has (1) refused to submit to a blood test pursuant to Vehicle and Traffic Law § 1194 (1) based on expressed reli-

gious beliefs, and (2) who further may claim in the course of subsequent proceedings now pending that the mandatory revocation of said license and the use of his refusal as evidence in a criminal trial pursuant to Vehicle and Traffic Law § 1194 (2) would be a per se violation of his constitutionally protected right of free exercise of religion.

Although free exercise of religious belief is constitutionally protected against infringement, religious practices that are inimical or detrimental to public health or welfare are clearly not. *(Reynolds v United States,* 98 US 145 [1878]; *Davis v Beason,* 133 US 333 [1890]; *Cantwell v Connecticut,* 310 US 296 [1940].)

### AMPLIFIED FACTS

The defendant (Sukram) states himself to be a Jehovah's Witness who is alleged to have been involved in an automobile accident wherein an innocent third-party driver was injured (charges pending are Vehicle and Traffic Law § 1192 [3]; § 511 [1] [a]; § 1180 [A]; § 600 [2] [a]). The defendant purportedly fled the scene of that accident on foot alone, and walked to a local hospital. Later, after a search, Troopers located him at that hospital, at which time Sukram allegedly told them that he "had a beer in Brooklyn" and that he was indeed driving the car at his father's request because his father was "too drunk to drive." (These statements were *all* admitted by the court at the stated *Huntley* hearing.) The Trooper properly provided both *Miranda* and Vehicle and Traffic Law "refusal" warnings and would have requested defendant's submission to a breathalyzer test but for the fact that the two-hour time limit was about to expire: a test kit was not accessible in time. The defendant, 20 years of age, together with his mother (who arrived on the hospital scene), refused the blood test on, *inter alia,* religious principles, stating that they (Jehovah's Witnesses) believed that the *giving up* of blood was contrary to their religion. Although this court always believed the Jehovah creed only prevented *accepting* of foreign blood, I shall assume arguendo that the statement is in conformity with that creed, or some division of it, for purpose of this discussion.

### DISCUSSION

The revocation of the defendant's driver's license and the subsequent use of his refusal to submit to a blood test as

evidence against him at a criminal proceeding pursuant to Vehicle and Traffic Law § 1194 (2) would not violate any New York State or Federally protected rights.

The defendant presumably reserved his right to assert that either of these two mandatory acts would violate his constitutionally protected right to free exercise of religion, *inter alia.* However, there exists a clearly drawn distinction between the freedom to believe, which is absolute, and acts which can be regulated because they pose a clear and unequivocal threat to society. *(Matter of Holy Spirit Assn. for Unification of World Christianity v Rosenfeld,* 91 AD2d 190, *lv denied* 63 NY2d 603 [1984].)

Through the interpretation of the First and Fourteenth Amendments to the US Constitution, courts in New York and around the Nation have drawn a clear distinction between beliefs and practices. *(See, Matter of Sampson,* 65 Misc 2d 658, *affd* 37 AD2d 668, *affd* 29 NY2d 900 [1972].) This important distinction is further supported by the literal reading of NY Constitution, article I, § 3, which *expressly* provides for the regulation of acts that are inimical or detrimental to the public welfare. Thus, it is required that New York revoke the defendant's driver's license under the statute.

Furthermore, in New York, any person who operates a motor vehicle is deemed to have given his consent to a chemical test of his breath, blood, urine or saliva for the purpose of determining the alcoholic or drug content in the body (Vehicle and Traffic Law § 1194 [1]). Although a person may indeed refuse to submit to a chemical test, the State will then merely enforce the statutory mandate and revoke the driver's license for a stated period.

It is clear that New York may both require testing of this nature and impose penalties for its violation. Courts have traditionally upheld a distinction between individual "rights" stemming from constitutional or common-law sources and mere "privileges" bestowed by government: the latter can be withheld absolutely and, ergo, may be withheld conditionally. *(Bailey v Richardson,* 182 F2d 46 [DC Cir 1950], *affd* 341 US 918 [1951].)

Thus, since issuance of a driver's license is a privilege, granted by the State and not a right, the State can condition receipt of it, or absolutely revoke it. *(Matter of Anderson v Macduff,* 208 Misc 271 [1955].) "The power of the State to provide for the general welfare of its people authorizes it to

prescribe all such regulations as, in its judgment, will \* \* \* tend to secure them against the consequences of ignorance and incapacity as well as of deception and fraud" (i.e., claiming adherence while admitting deviation) *(Dent v West Virginia,* 129 US 114, 122 [1889]; *see,* Tribe, American Constitutional Law, at 682 [2d ed 1988]). Indeed, the State mandates certain requirements that must be met prior to issuance of a driver's license, such as written tests, road tests, age requirements, and minimum insurance coverage. These requirements exist in order to insure safer roadways for drivers and pedestrians alike, a truly compelling State interest.

We all have a compelling interest in seeing that our laws are enforced, such as insuring that roadways are safe for public travel and safe from both drunk drivers and drivers using illegal drugs. Insuring that our roadways are safe for travel is not *a* compelling reason, it is *the* paramount reason. *(People v McAleavey,* 133 Misc 2d 987 [1986].) Owing to the grave nature and effects involved in driving under the influence of drugs or alcohol (the death of thousands of innocent people annually), we must enforce our laws to protect society as a whole. Indeed, the gravity of this particular type of situation has been clearly noted in both the 1981 legislative and executive memoranda wherein the penalties for violators and repeat offenders of the DWI laws were increased substantially, and in the legislative preamble to Laws of 1981 (ch 910, § 1).

When balancing the two competing interests, the State's regulation must be carried out in the least restrictive means unless the exemption of the activity would unduly interfere with the fulfillment of its compelling State interest. *(Bangor Baptist Church v State of Me., Dept. of Educ. & Cultural Servs.,* 549 F Supp 1208 [Me 1982].) In the instant case, the two-hour testing limit would have expired by the time the Trooper could have retrieved a breathalyzer kit thereby requiring that a different chemical test be given, in this case a blood test.

The rationale underlying the mandatory revocation and its use of a refusal to submit to a blood test as evidence in the subsequent criminal proceeding is based upon the rationale that a person who had not been drinking nor taken drugs would be without any reason to refuse any of the tests, and that only those who had something to fear would refuse. "[T]he statute itself equates a refusal with guilt \* \* \* and \* \* \* [i]t [is] quite obvious that the primary reason for a

refusal to submit to a [blood] test is that a person fears its result." *(People v Smith,* 79 Misc 2d 172, 175 [1974].) As noted Chief Justice Traynor of California so cogently observed, "[a] guilty party may prefer not to find himself in a situation where consciousness of guilt may be inferred from his conduct, but it can scarcely be contended that the police, who seek evidence from the test itself, will tend to coerce parties into refusing to take tests in order to produce this evidence." *(People v Ellis,* 65 Cal 2d 529, 537, 421 P2d 393, 397 [1966].)

Were this court to accept a defendant's assertion that his refusal was based on religious belief, and that either the mandatory revocation or the use of his refusal as evidence at a criminal proceeding pursuant to Vehicle and Traffic Law § 1194 (2) would violate his constitutionally protected right to free exercise, excluding him from operation of the statute, the court would " 'make the professed doctrines of religious belief superior to the law of the land, and in effect * * * permit every citizen to become a law unto himself.' " *(Davis v Beason,* 133 US 333, 344 [1890], *supra.)*

Thus, the question on this court's mind since the January 19, 1989 hearing is whether persons who refuse to submit to blood tests because of legitimate religious beliefs should be exempt from the operation of the statute? If the court were to rule that they were, " 'then those who do not make [refusal] a part of their religious belief may be found guilty and punished, while those who do must be acquitted and go free.' " *(Davis v Beason,* 133 US, *supra,* at 344.) What, hypothetically, were we to do should a defendant believe that human sacrifices were necessary to religious adherence? It would certainly be ridiculous to say that the civil government under which he lived could not interfere to prevent such conduct. *(Davis v Beason, supra,* at 344.)

The refusal to submit to a blood test does not seem, at first blush, to be as harmful to the public well-being as some other activities; however, there still exists the possibility, as here, that an innocent person could be severely injured or killed, and denied the use of test results in a subsequent civil suit to recover for damages against an intoxicated driver.

It is interesting to note that the defendant and his mother claim that it was his deep religious conviction which compelled him to refuse the blood test, despite his admission to drinking an alcoholic beverage earlier that evening. The drinking of *any* alcoholic beverage, in this court's understand-

ing, is *itself* a violation of the strict tenets of the faith of Jehovah's Witnesses. Should the court be made to choose which practices are more important than another? Should this court honor religious tenets violated by the defendant *himself?* This fact merely casts an additional shadow over the defendant's nebulous assertions. Perhaps (speculatively) the defendant was satisfied that his interests would be better served by refusing submission than by risking disclosure of whatever the test might have revealed as to the alcoholic content of his blood. *(People v Thomas,* 46 NY2d 100 [1978].)

In the case of *Reynolds v United States (supra)* the United States Supreme Court dealt with the constitutionality of a statute which prohibited polygamists from voting in any election, holding any position of honor and which required those who desired to vote to take an oath that they were neither bigamist or polygamist. In it, the court, referring to the writings of Thomas Jefferson, drew a distinction between religious belief and religious practice. The court there made clear that "[l]aws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices." *(Supra,* at 166; *see, Matter of Sampson,* 65 Misc 2d 658, 665, *supra.)*

In the *Sampson* case *(supra),* the court found that a family's religious practice had to give way before the State's interest in the welfare of a child. Similarly, even if it were against the religious practice of Jehovah's Witnesses to consent to the withdrawal of blood, the State's interest in maintaining safety on the highways by keeping them free of drunk drivers would prevail. Consequently, the defendant in the type of case at bar has the clear option to not drive, or drive knowing that refusal to submit to a chemical or blood test will result in the mandatory revocation and use of such refusal as evidence in a subsequent criminal proceeding, as it would for everyone else.

The Jehovah's Witnesses in medical refusal treatment cases risk death; the defendant, in the case before the court, may waive driving privileges by strict adherence. The State, in both instances, respects the claimant's religious adherence; however, in the instant case, the State properly and constitutionally imposes a mandatory penalty, uniformly and equally upon *all* persons who refuse submission to a blood test. We have no rational choice as a society.

## CONCLUSION

The court adheres in full to its prior oral decision admitting

all alleged statements, and again declines to suppress any of defendant's statements or evidence, or to dismiss on any constitutional grounds whatsoever. The matter continues on the ready Trial Calendar in Part 4.