OPINION OF THE COURT
James C. Harberson, Jr., J.
Introduction
This matter is before the court for sentencing under Leandra’s Law, New York’s newest anti-DWI measure. The defend *739 ant pleaded guilty to driving while intoxicated pursuant to Vehicle and Traffic Law § 1192 (3).
The State enacted Leandra’s Law (L 2009, ch 496)[1] November 18, 2009, roughly one month after the DWI death of 11-year-old Leandra Rosado in New York City.[2] 3It demands, inter alia, that all first-time, misdemeanor DWI offenders install ignition interlock devices in every automobile they own or operate for at least six months. It further requires, barring indigency, that offenders pay for installation and maintenance of the interlock devices. However, like so many products rushed to market prematurely, Leandra’s Law exhibits numerous defects imperiling its constitutionality.[3]
Discussion
L
It should be noted at the outset that lower courts generally should eschew constitutional questions related to statutes unless absolutely necessary. (See People v Alexis, 14 Misc 3d 978, 981 [Sup Ct, Kings County 2007] [“The court notes that courts of original jurisdiction should ordinarily refrain from determining the constitutionality of statutes. However, such determinations are permissible if the conclusion is inescapable and the invalidity of the act is apparent on its face” (citations omitted)]; People v Brian L., 17 Misc 3d 724, 729 [Watertown City Ct 2007] [a court should not strike down a statute unless it is clearly unconstitutional].) Those seeking to prove statutes unconstitutional must do so “beyond a reasonable doubt.” (Matter of State of New York v Farnsworth, 75 AD3d 14, 20 [4th Dept 2010], quoting People v Tichenor, 89 NY2d 769, 773 [1997], cert denied 522 US 918 [1997].) In this case, constitutional questions are unavoidable.
*740 IL
The issues to be considered stem primarily from the State’s failure to establish determinate ignition interlocking costs. The first is whether the indeterminate nature of the cost of installing and maintaining ignition interlock devices invalidates the requirement that defendants pay for the devices, given the cost is statutorily classified as a fine and therefore constitutes a criminal punishment. That issue informs a related, New York constitutional concern whether the State violated New York constitutional law by failing properly to promulgate a final interlock cost list. Next, we will examine whether the lack of a statutory metric for determining a defendant’s ability to pay for the ignition interlock device violates equal protection because it may lead to arbitrary enforcement. Also at issue on equal protection grounds is whether requiring defendants to interlock every auto they own or operate is justifiable.
III.
Subdivision (5) (a) of amended Vehicle and Traffic Law § 1198 requires those convicted to finance ignition interlock device installation and maintenance unless the sentencing court determines they cannot afford to do so. (Vehicle and Traffic Law § 1198 [5] [a] [“The cost of installing and maintaining the ignition interlock device shall be borne by the person subject to such condition unless the court determines such person is financially unable to afford such cost whereupon such cost may be imposed pursuant to a payment plan or waived”]; see also 9 NYCRR 358.8 [a] [“Any operator shall pay the cost of installing and maintaining the ignition interlock device unless the operator has been determined to be financially unable to afford the cost of the ignition interlock device by the sentencing court whereupon such cost may be imposed pursuant to a payment plan or waived”].) The law classifies the installation and maintenance costs as a criminal fine. (Vehicle and Traffic Law § 1198 [5] [a] [“Such cost shall be considered a fine for the purposes of subdivision five of section 420.10 of the criminal procedure law”].) Accordingly, failure to pay for the interlock device may prompt imprisonment. (CPL 420.10 [3] [“Where the court imposes a fine, restitution or reparation, the sentence may provide that if the defendant fails to pay the fine, restitution or reparation in accordance with the direction of the court, the defendant must be imprisoned until the fine, restitution or reparation is satisfied”].)
*741 Notwithstanding their status as criminal fines, the interlock costs are ultimately indeterminate. This indeterminacy stems from the intentionally open-ended manner by which the State chose to calculate them. The New York State Division of Probation and Correctional Alternatives (DPCA) (now known as the Office of Probation and Correctional Alternatives [OPCA], a subdivision of the Division of Criminal Justice Services [DCJS, the Department]) created a regulatory scheme whereby private companies, following an application and approval process, contracted with the State to provide and maintain interlock services. (9 NYCRR 358.1 et seq.) The prices they charge conform to a “maximum fee/charge schedule with respect to all operator’s costs associated with such devices.” (9 NYCRR 358.5 [c] [3].)
Because not everyone sentenced to interlocking can afford it, the Department had to contrive a means to pay for interlocking for indigent drivers (or, “operators”).[4] Rather than having local governments finance them, the Department insisted that the “qualified manufacturers”[5] (nominally, at least)[6] pay for them:
“The new law establishes that the court, upon determining financial ‘unaffordability’ to pay the cost of the device, may impose a payment plan with respect to the device or waive the fee. New Vehicle and Traffic law statutory provisions require that where the cost is waived, DCJS through its regulation shall determine who bears the costs of the device or through such other agreement which may be entered into. Accordingly, DCJS’ regulation requires qualified manufacturers, and not local governments or taxpayers to bear such costs.” (NY Reg, Nov. 3, 2010, at 3.)
During the application process, manufacturers supply proposed fee structures that must “take into consideration and *742 be based upon an anticipated ten percent (10%) waiver of the fees by sentencing courts due to operator unaffordability.” (9 NYCRR 358.5 [b] [2].) The ten percent figure derives from the Department’s “speculation] based upon [the] experience of other-states.” (NY Reg, Nov. 3, 2010, at 3.)
Defendants claiming indigency are obliged to seek a payment waiver from the court. (9 NYCRR 358.8.) To obtain the waiver, they must complete and submit to the court a financial history/ status form prepared by the Department designed to aid the court’s indigency determination. (9 NYCRR 358.8 [b].) Curiously, the law supplies no indigency metric to guide the court; nor is the court obliged to use the financial history form in making its determination. (See Vehicle and Traffic Law § 1198 [4] [a]; 9 NYCRR 358.8 [b].) Ironically, DPCA developed the form to remedy perceived shortcomings in the statute:
“[a]s the statutory language does not refer to ‘indigency’ nor contain other limiting criteria based upon prescribed income levels or guidelines, including federal poverty, food stamps and participation in other government assistance programs, DPCA developed the FDR [Financial Disclosure Report] form to provide the judiciary with information to better gauge whether the operator has resources to pay for device installation and maintenance.” (Mem of Div of Grim Just Servs, Off of Probation and Correctional Alternatives, No. 2010-07 [June 14, 2010].)
As of July 15, 2010, the Department has approved seven qualified manufacturers, and, via memorandum, has published a list of each provider’s prices for services. (Mem of Robert M. Maccarone, Deputy Commissioner and Director, Div of Grim Just Servs, Off of Probation and Correctional Alternatives, No. 2010-09 [July 15, 2010] [“A matrix of pertinent information, including the name of the manufacturer, model of the ignition interlock device, features, class as characterized by state regulations, and cost schedule are provided for your information”].) The listed prices constitute the maximum fees permitted by section 358.5 (c) (3): “the prices represented in the matrix are maximum or ceiling prices.” (Mem of Robert M. Maccarone, Deputy Commissioner and Director, Div of Crim Just Servs, Off of Probation and Correctional Alternatives, No. 2010-09 [July 15, 2010].)
These costs are not final, however. Besides setting up the possibility of annual rate increases (“On or about February 15, *743 2011 and annually thereafter, the division shall review requests by qualified manufacturers for rate adjustments which shall include information submitted by qualified manufacturers involving unaffordability waivers granted by courts” [9 NYCRR 358.5 (b) (2)]), section 358.5 permits the Department unilateral discretion to raise rates at any time. (9 NYCRR 358.5 [b] [2] [“At its discretion, the division shall approve rate adjustments where appropriate”].) Moreover, nothing in section 358.5 prohibits manufacturers from increasing operator prices mid-contract. (9 NYCRR 358.5.)[7] DPCA/OPCA Director Robert Maccarone quite candidly explained in a recent information session for New York judges that the Department retains such pricing power to ensure the ongoing viability of the provider-subsidy scheme for indigent defendants:
“But, if indeed, even a payment plan is determined unfeasible and it is determined that this person is unable to afford it, then the manufacturers will provide the ignition interlock device and they will do so free of charge because implicit in the cost schedules that they submitted as a condition of becoming a qualified manufacturer, consistent with our regulations, they assumed a 10% unaffordability rate statewide. That was based on our examination of other states.
“Importantly, if that exceeds 10% statewide, we have agreed in to [sic] allow the manufacturers to renegotiate their agreements. But, I think it is *744 important for judges to note that there’s a limit to what manufacturers will be able to bear before they leave the state. There are two primary issues that affect the viable programs nationwide, monitoring and we have a system in place for that, and secondly the issue of unaffordability and the provisions of those. And that’s why we designed the financial disclosure report form to provide judges with the most accurate information concerning each operator.” (Off of Ct Admin, DWI Update: Leandra’s Law & More - Q & A, July 13, 2010, Webcast transcript, at 21.)[8]
We turn now to the constitutional analysis.
IV
The legislature’s failure statutorily to fix the ignition interlock costs presents a significant due process problem. (See US Const Amend XTV; NY Const, art I, § 6; People v Brignoni, 182 Misc 2d 779, 785 [Crim Ct, Bronx County 1999] [“A due process violation occurs when an individual is deprived of his life, liberty or property through a procedure which is so vague and indefinite that it is really not a rule or standard at all”]; United States v Batchelder, 442 US 114, 123 [1979] [“vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute”].) Due process is offended here because potential offenders and the general public cannot determine the punishment for violating the law, given that ultimate interlock costs are subject to administrative fiat.
Such ambiguity requires invocation of the rule of lenity, a statutory construction doctrine rooted in due process that protects defendants against ambiguities informing the scope of and punishments required by criminal statutes. (See Dunn v United States, 442 US 100, 112 [1979] [the rule of lenity “is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited”]; United States v Granderson, 511 US 39, 54 [1994] [applying rule of lenity to sentencing/ probation revocation statute]; Sash v Zenk, 439 F3d 61, 64 [2d Cir 2006] [“The rule of lenity . . . (is) concerned with notice *745 and fair warning . . . (and applies to) situations in which a legislature fails to give notice of the scope of punishment by leaving ‘a grievous ambiguity or uncertainty in the language and structure of the (statute), such that even after a court has seized everything from which aid can be derived, it is still left with an ambiguous statute’ ”], citing United States v Lanier, 520 US 259, 266-267 [1997], and quoting Chapman v United States, 500 US 453, 463 [1991]; see also Manning, Clear Statement Rules and the Constitution, 110 Colum L Rev 399, 406 n 26 [2010] [“In the realm of statutory interpretation, the court implements these due process requirements (of ‘fair notice and nonarbitrary law enforcement’) through the rule of lenity, which requires courts to give criminal defendants the benefit of the doubt when criminal statutes contain ambiguity concerning the elements of an offense or its punishment”], citing Granderson at 54 and Dunn at 112.) When applied to punishments, the rule requires that defendants receive the lesser of the sanctions constructively afforded by the statute. (See People v Jackson, 106 AD2d 93, 96 [2d Dept 1984] [“if two constructions of a criminal statute are plausible, the one more favorable to the defendant should be adopted in accordance with the rule of lenity”], citing Williams v United States, 458 US 279, 290 [1982], United States v Bass, 404 US 336, 347 [1971] and Rewis v United States, 401 US 808, 812 [1971]; see also People v LaPage, 25 Misc 3d 890, 892 n [St. Lawrence County Ct 2009] [“where a legislature fails to give notice of the scope of punishment by leaving ambiguities in a statute, the rule should be applied to give defendant the lesser of two available penalties”].)
Here, the ambiguity lies in the fact that the State failed to provide constitutionally-required notice of the interlock fine amounts facing DWI convicts, given DCJS can, at its discretion, raise interlock rates. Because the defendant has not been afforded such notice, lenity forbids the court from ordering him to finance interlock device installation and maintenance. Instead, the State must find an alternative funding source for any interlock device the defendant is required to install and maintain.
V
Compounding the notice problem is the fact that the “final” price list for interlock services has not been filed with New York’s Secretary of State. Instead, the latest filing provides only an estimate of the interlock costs. (NY Reg, Nov. 3, 2010 [“DCJS *746 documentation of fee structure received from interested qualified manufacturers indicates an average $75-$100 installation charge and a similar monthly maintenance charge”].) Such failure violates New York’s Constitution, which requires that newly-enacted rules be filed with the Secretary of State for effectuation. (See NY Const, art iy § 8 [“No rule or regulation made by any state department, board, bureau, officer, authority or commission, except such as relates to the organization or internal management of a state department, board, bureau, authority or commission shall be effective until it is filed in the office of the department of state. The legislature shall provide for the speedy publication of such rules and regulations by appropriate laws”]; People v Bremner, 51 Misc 2d 632, 633 [Ct Spec Sessions, Town of Elbridge, Onondaga County 1966] [“It is well established that the rules and'regulations of a department head to be effective and enforcible must be published”]; People v Calabro, 7 Misc 2d 732, 732-734 [Albany Recorder’s Ct 1957] [dismissing charge against motorist because rule premising offense had not been filed with the Secretary of State].)
The publication requirement is simple and obvious: rules and regulations to which citizens are held accountable must be available to them:
“The Constitution, in the clearest of language, requires that every rule and regulation made by board, bureau, officer, authority or commission— ‘except such as relates to the organization or internal management’ of such office or agency — be filed in the office of the Department of State if it is to be effective. We know that underlying the provision was the desire to have all rules and regulations affecting the public filed in one, easily available, central place. We should not strive to read exceptions into the section or construe it so as to permit the official in charge of the bureau, commission or authority to avoid the necessity of filing by attaching the label ‘order’ or ‘statement of policy’ or some other term to what is essentially a rule or regulation. The spirit and design of the constitutional provision are best effectuated by requiring the administrator, if he wishes the rules and regulations of his agency or department to be effective, to file them no matter what label is assigned to them.” (People v Cull, 10 NY2d 123, 129 [1961].)
*747 That the State has designed the system such that no final cost can be ascertained does not suspend its obligation to publish a statement of those costs, given that it elected to classify them as criminal fines.
The Department might contest the publication requirement related to costs on two grounds, neither of which is persuasive. First, it might argue that the master fee list does not constitute a “rule” per State Administrative Procedure Act § 102, which excludes from the publication requirement “any fee which is . . . established through negotiation, written agreement or competitive bidding, including, but not limited to, contracts, leases, charges, permits for space use, prices, royalties or commissions.” (State Administrative Procedure Act § 102 [2] [b] [xi] [4].) Section 358.5, which governs the approval process of prospective interlock manufacturers, requires those applying for certification to provide
“[f]ee structure information . . . including] any and all fees charged to the operator, including but not limited to installation fee, monthly fee, any special service fees, shipping fee, and de-installation fee. The proposed fee structure shall take into consideration and be based upon an anticipated ten percent (10%) waiver of the fees by sentencing courts due to operator unaffordability.” (9 NYCRR 358.5 [b] [2].)
Accordingly, the Department might contend, the fees need not be published to be lawful.
But for constitutional notice requirements, this analysis might survive. However, as explained above, due process requires that criminal laws be drafted so as to inform the public of the scope of punishment for those convicted. Failure to notify the public of the master fee schedule is failure to specify the possible fines facing violators of Vehicle and Traffic Law § 1192. Due process requires such publication.
The Department might also point to administrative cases in the healthcare context to avoid the publication requirement. (See Matter of Tenenbaum v Axelrod, 132 AD2d 37 [3d Dept 1987]; see also New York State Health Facilities Assn. v Axelrod, 154 AD2d 10, 12-13 [3d Dept 1990] [reaffirming the holding in Tenenbaum].) Tenenbaum involved challenges a nursing home operator made to the State’s Medicaid reimbursement scheme and whether the State properly noticed limitations upon reimbursement via publication with the Secretary of State. (Te *748 nenbaum at 38-40.) The Appellate Division, Third Department, found that the State Department of Health satisfied the publication requirement when declaring that Medicaid reimbursements were subject to “historical limitations set forth by the commissioner,” even though the Department failed to publish a detailed list of such limitations. (Id. at 39-40 [“Although the language ‘historical limitations set forth by the commissioner’ (10 NYCRR 86-2.21 [c] [2]) is less precise than we would like, it does satisfy the purposes underlying the filing requirement. It puts the public on notice that there is a limit on the actual costs that will be reimbursed, it informs them that the limits have been set, and it suggests to those interested that the exact figures may be obtained from respondent”].) Accordingly, the Department would contend, the ambiguity permitted in this matter concerning reimbursement rates covers should permit a similar gloss in this case, and the publication requirement is satisfied so long as the motoring public has some indication of the interlock costs associated with DWI convictions.
This argument suffers the same defect as the last. It does not account for due process notice requirements for criminal statutes. Moreover, Tenenbaum concerns the give-and-take business relationship between a state contractor/nursing home operator and the State Department of Health, which is hardly comparable to the relationship between motorists at large and the Department. Sophisticated business people depending upon state funding for survival are simply not in the same position as average motorists who have little if any cause to interact with the Department.
Accordingly, because the Department has failed to submit a determinate list of applicable fines for publication by the Secretary of State, the court cannot compel the defendant to pay for interlocking.
VL
The State’s failure to provide adequate legal guidance to judges making indigency determinations threatens defendant’s right to equal protection of the law.
Equal protection of the law demands that similarly situated persons receive equal treatment under the law. (US Const Amend XIV; NY Const, art I, § 11; Cleburne v Cleburne Living Center, Inc., 473 US 432, 439 [1985] [“The Equal Protection Clause of the Fourteenth Amendment commands that no State shall ‘deny to any person within its jurisdiction the equal protec *749 tion of the laws,’ which is essentially a direction that all persons similarly situated should be treated alike], quoting Plyler v Doe, 457 US 202, 216 [1982].) The State denies equal protection “ ‘when it treats persons similarly situated differently under the law . . . , and this difference may be created by the grant of a preference as well as by the imposition of a burden.’ ” [Countryman v Schmitt, 176 Misc 2d 736, 747 [Sup Ct, Monroe County 1998], quoting Matter of Abrams v Bronstein, 33 NY2d 488, 492 [1974].) “New York’s Equal Protection Clause is construed in pari materia with its Federal analog.” (Id. at 748, citing Under 21, Catholic Home Bur. for Dependent Children v City of New York, 65 NY2d 344, 360 n 6 [1985].)
That said, legislative enactments are presumed constitutional unless they imperil exercise of a fundamental right or lack a rational basis:
“The general rule with respect to equal protection claims is that a legislative body is presumed to act within its constitutional power despite the fact that, in practice, its laws ‘ “result in some inequality” ’ (Nordlinger v Hahn, 505 US 1, 10). ‘[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate [governmental] interest’ (Nordlinger v Hahn, supra, at 10).” (Welch Foods v Wilson, 277 AD2d 882, 887 [4th Dept 2000].)
Rational basis scrutiny is a largely deferential standard demanding judicial restraint and presumption of a statute’s constitutionality. (See Dalton v Pataki, 5 NY3d 243, 265-266 [2005] [“When reviewing using a rational basis standard, ‘a classification must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification . . . (I)ndeed, a court may even hypothesize the motivations of the state legislature to discern any conceivable legitimate objective promoted by the provision under attack’ ”], quoting Port Jefferson Health Care Facility v Wing, 94 NY2d 284, 290-291 [1999]; People v Williams, 27 Misc 3d 226, 233-234 [Sup Ct, Kings County 2010] [“The ‘rational basis’ test to defeat an equal protection argument is far from a demanding one; it requires employment of judicial restraint; it may be met by any reasonably conceivable state of facts to support the classification; and *750 the rationale for the classification need not be articulated in the legislation itself’].) However, the test is not a rubber stamp: “The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.” (Prodell v State of New York, 166 Misc 2d 608, 613 [Sup Ct, Albany County 1995], quoting City of Cleburne v Cleburne Living Center at 446, and citing Nordlinger v Hahn, 505 US 1 [1992].)
Because New York does not recognize licensed driving as a fundamental right, the court employs rational basis scrutiny in examining the law. (See People v Sukram, 142 Misc 2d 957, 959-960 [Nassau Dist Ct, 1st Dist 1989] [issuance of driver’s license privilege, not fundamental right]; see also Matter of Femia v Administrative Appeals Bd. of N.Y. State Dept. of Motor Vehs., 42 AD3d 951, 951 [4th Dept 2007] [no fundamental right to license retesting].)
The State’s failure to afford judges any guidance for determining indigency invites chaos. Similarly situated defendants statewide have no assurance their financial circumstances will receive similar treatment because every court enjoys essentially standardless discretion in determining ability to pay. Indeed, courts need not even consider the financial history information the Department obliges defendants seeking a waiver to complete for determining waiver eligibility. Such is a textbook equal protection violation, because the State provides no principled way for apportioning criminal fines among similarly-situated defendants.
The lack of guidance has another potential and troubling implication. It could be used to pressure courts to help maintain the indigency-waiver system the Department has devised by suggesting that issues of systemic integrity should inform indigency determinations. That is, judges might fear that granting too many indigency waivers could undermine the ignition interlock program by making it unprofitable for manufacturers. Director Maccarone appears tacitly to have suggested as much when he addressed judges regarding this issue last summer: “But, I think it is important for the judges to note there’s a limit to what manufacturers will be able to bear before they leave the state.” (Off of Ct Admin, DWI Update: Leandra’s Law & More - Q & A, July 13, 2010, Webcast transcript, at 21.) Such is a recipe for widespread corruption.
Consequently, section 358.8 is fatally defective because it affords courts seeking to apply it no guidance in determining indi *751 gency. The subdivisions of that section requiring the court to make indigency determinations are therefore invalid. Accordingly, the court cannot grant indigency waivers to anyone seeking them.
VIL
We next consider whether the requirement that defendants install an interlock device in every auto they own or operate violates the Equal Protection Clauses of the Federal and New York Constitutions. Vehicle and Traffic Law § 1193 (1) (b) (ii) demands that
“the court shall also sentence such person convicted of a violation of subdivision two, two-a or three of section eleven hundred ninety-two of this article to a period of probation or conditional discharge, as a condition of which it shall order such person to install and maintain, in accordance with the provisions of section eleven hundred ninety-eight of this article, an ignition interlock device in any motor vehicle owned or operated by such person during the term of such probation or conditional discharge imposed for such violation of section eleven hundred ninety-two of this article and in no event for less than six months.”
Notwithstanding the supplicant posture rational basis scrutiny obliges (discussed above), the court is skeptical of the all-auto requirement, for reasons the Pennsylvania Court of Common Pleas provided when addressing the same requirement in a Pennsylvania ignition interlock statute. (See Commonwealth v Mockaitis, 54 Pa D & C 4th 115 [2001].) After determining that licensed driving was a privilege (not a right) under Pennsylvania law and submitting the requirement to a rational basis equal protection analysis, the court dispatched the all-auto requirement:
“Applying the above analysis to Act 63, we are satisfied that to treat offenders differently based upon the number of vehicles owned by each creates an arbitrary classification which does not bear a fair and substantial relationship to the object of the legislation. Legislation that prohibits a multiple DUI offender from operating a vehicle that is not equipped with an ignition interlock device would be reasonable. Legislation that prohibits the offender from operating a vehicle equipped with the ignition *752 interlock device unless every vehicle the offender owns is also equipped with such a device is neither reasonable nor does it bear a rational relationship to the ultimate goal of limiting the driving privilege of the offender. Likewise, to require the offender to actually own a vehicle that is equipped with the device in order to secure a restricted license bears no reasonable relationship to the object of the legislation.
“It does not take long to come up with numerous examples of just how arbitrary and unreasonable the classification in Act 63 is when applied to owners of multiple vehicles. It makes no sense, nor does it serve any legitimate purpose, to require an offender’s spouse, or other person the offender owns a vehicle with, to operate that vehicle equipped with an ignition interlock device so that [the] offender can operate a similarly equipped separate automobile. Nor is it rational to have the offender’s child, attending college, equip a vehicle being used at school with such a device, simply because it is titled in the parent’s name. Perhaps the most absurd result occurs in situations where the offender owns several vehicles which are operated solely by employees. A plumber with multiple service vehicles comes to mind. It serves no rational purpose to have all of those vehicles equipped with an ignition interlock device . . .
“We have considered the possibility that an offender might be more likely to drive his or her unequipped vehicle in violation of a restricted license. However, this does not provide a rational basis for the classification. Ownership of the vehicles will not make the offender more or less likely to violate the law. If the offender cannot obtain a restricted license because of the inability to afford an ignition interlock device on all of his or her vehicles, is that person any less likely to violate the law by driving without a license?” {Id. at 124-125, 125 n 7 [footnote omitted].)
Accordingly, we invalidate the requirement that those obliged to drive interlocked cars must install an interlock device in every car they own or operate. Instead, they need only install the device in any car they operate.
*753 VIII.
In sum, the court holds the defendant cannot be obliged to pay for any ignition interlock device to be installed on any automobile he or she owns or operates. The reason for this is twofold. First, the State has failed to provide adequate notice of the costs related to interlock device installation and maintenance. Second, no final, determinate interlock cost list has been properly filed with New York’s Secretary of State, as New York’s Constitution requires. If the State seeks to have interlock devices installed in defendants’ automobile(s), it must find alternative funding sources to do so. Additionally, the court holds that 9 NYCRR 358.8 and Vehicle and Traffic Law § 1198 (4) are unconstitutional to the extent that they require the court to make indigency determinations without a statutory metric for ascertaining indigency. Accordingly, the court will grant no indigency waivers. Lastly, the court holds that Vehicle and Traffic Law § 1193 (1) (b) (ii)’s requirement that defendant install interlock devices in every car he owns or operates is unconstitutionally overbroad and therefore limits the installation requirement to any car a defendant chooses to operate.
The defendant is sentenced to pay a $500 fine and a $395 surcharge victim fee. His driver’s license is revoked for six months. He is given a conditional discharge to take and complete successfully a drinking driver program authorized by New York State within one year. Moreover, for a six-month period, he is prohibited from operating an automobile without an ignition interlock device. He has 10 business days from today to have an ignition interlock device installed in any auto he chooses to drive. He may have a 20-day extension of his license.

. Citations to Vehicle and Traffic Law sections herein shall refer to those amended by Leandra’s Law (L 2009, ch 496).

. Leandra Rosado died October 11, 2009. (Elgion, Driver in Crash That Led to Tougher Law is Sentenced, New York Times, Oct. 29, 2010, http:// www.nytimes.com/2010/10/30/nyregion/301eandra.html?_r=l.) Leandra’s Law was passed November 18, 2009. (Press Release, Governor David A. Paterson, Governor Paterson Signs Groundbreaking DWI Legislation Into Law, Nov. 18, 2009.)

. The court notified the New York Attorney General’s Office that it was considering finding parts of Leandra’s Law unconstitutional. The Office declined to appear but has reserved the right to challenge the court’s decision on appeal.

. An “operator” is “a person who is subject to installation of an ignition interlock device for a felony or misdemeanor under the Vehicle and Traffic Law or the Penal Law.” (9 NYCRR 358.3 [o].)

. “The term ‘qualified manufacturer’ shall mean a manufacturer or distributor of an ignition interlock device certified by the New York State department of health which has satisfied the specific operational requirements herein and has been approved as an eligible vendor by the division in the designated region where the county is located.” (9 NYCRR 358.3 [p].)

. Since the cost of supplying “free” interlock devices is merged with the overall prices to be charged, those paying for their interlock devices are effectively compelled to subsidize those who cannot. The court leaves for another day the issue of the propriety of compelling wealthier defendants to pay fines for indigent ones.

. Section 358.5 (c) (3), which describes the contractual obligations manufacturers must adhere to when doing business with operators, provides that operators must
“agree to adhere to a maximum fee/charge schedule with respect to all operator’s costs associated with such devices, offer a payment plan for any operator determined to be financially unable to pay the cost of the ignition interlock device where a payment plan is so ordered, and provide a device free of fee/charge to the operator where the cost is waived by the sentencing court, or pursuant to such other agreement as may be entered into for provision of the device. Any contractual agreement between the operator and the qualified manufacturer or its installation/serviee providers shall permit an early termination without penalty to the operator when a certificate of completion has been issued, where the sentence has been revoked, and whenever the operator has been transferred to a jurisdiction where the manufacturer does not do business. Nothing shall prevent a qualified manufacturer from lowering the fee/charge schedule during the course of an operator’s contract and/or the contractual agreement with the division.”

. Also adding to the cost indeterminacy is the requirement that operators “prior to installation . . . complete mechanical repairs or adjustments where necessary for the proper functioning of the device.” (9 NYCRR 358.5 [d] [12].)